UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-717-CRS-CHL

BABCOCK POWER, INC., et al.,                                          Plaintiffs,

v.

STEPHEN T. KAPSALIS, et al.,                                         Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is a "Motion for Fees" (DN 242) filed by plaintiffs Babcock Power, Inc.

("Babcock") and Vogt Power International, Inc. ("Vogt Power"). Defendants Stephen T.

Kapsalis ("Kapsalis") and Express Group Holdings, LLC ("Express") filed a response (DN 259).

Plaintiffs filed a reply (DN 266). Therefore, this matter is ripe for review.

I.       **BACKGROUND**

A.       **Searches Performed by Digital Strata and Resulting Production of Documents**

Although there is no questioning the experience and competence of all counsel in this

case, the filings related to this motion are less than a model of clarity. Plaintiffs refer the Court

to their response (DN 233) to defendants' Motion for Protective Order and response (DN 235) to

defendants' Joint Motion for Sanctions for the relevant facts. (DN 242-1, p. 2.) Defendants refer

to defendants' Joint Motion for Attorneys' Fees (DN 187),[1] Express's response (DN 216) to

plaintiffs' Motion to Compel Discovery, and defendants' Motion for Protective Order (DN 219)

---

[1] The brief supporting the Joint Motion for Attorneys' Fees (DN 187-1) is the closest thing that any party has provided the Court that recounts the underlying facts; it, however, is not comprehensive. For example, it does not include communications between Kapsalis's counsel and Digital Strata regarding the production of the "backup.pst" file, nor does it include a discussion regarding the mislabeled documents produced by Digital Strata. (*See* DN 159, 159-2, p. 2; *see also* discussion *infra*.)

1

for the relevant facts.  (DN 259, p. 4.)  Therefore, the Court is left to extract facts from five filings (including exhibits), in addition to the three filings (including exhibits) submitted in conjunction with this Motion for Fees.  Another issue is that, while the Court is familiar with the allegations related to the instant motion, the parties assume that the Court is intimately familiar with the various searches conducted.  However, it appears that even the parties are not all on the same page.  The following is the Court's reconstruction of the relevant facts related to the search by third-party vendor Digital Strata and the document production resulting from that search.

At some point in early 2015, the parties apparently began negotiations regarding the terms of a search of the Kapsalis hard drives[2] and the Express server.  (*See* DNs 187-2, 187-3, 187-4.)  In the process of this negotiation, there was a phone call between employees of Digital Strata and the parties' technology experts, along with various e-mail communications with the parties' counsel to discuss the details of the searches to be conducted by Digital Strata.  (*See* DN 187-6 [e-mail correspondence from April 27, 2015 through May 11, 2015].)  The terms of the search were apparently memorialized in a proposed Agreed Order (DN 99) that was filed with the Court on June 3, 2015.  (*See* DN 187-7 [e-mails discussing filing of the proposed Agreed Order].)  Per the terms of the proposed Agreed Order (DN 99), the searches were to be conducted by a neutral third party vendor, Digital Strata.  Although the Court declined to enter the proposed Agreed Order (DN 99), it appears that the parties went forward with the searches as outlined in same.  The parties agreed to split the cost of the searches conducted by Digital Strata in half.  (*See* DN 109 [Agreed Order detailing search performed by Digital Strata].)  The Court

---

[2] The Court understands the "Kapsalis hard drives" to consist of forensic images of various computers and storage devices belonging to Kapsalis, including (1) 1 GB flash drive; (2) 16 GB flash drive; (3) 4 GB flash drive; (4) 250 GB hard drive; and (5) 2 images of a 500 GB laptop hard drive (collectively referred to as the "Kapsalis hard drives").  (*See* DN 187-1, p. 3 n.1; DN 196-3, pp. 4-5.)

2

believes that one of the purposes of the searches was to ascertain whether Kapsalis had transferred any documents belonging to plaintiffs to the Express server.  (*See* DN 187-2, p. 2.)

The Court will not repeat the entire proposed Agreed Order (DN 99) here, but will summarize the searches that were conducted (or were  to be conducted) by Digital Strata; the searches were also detailed in an Agreed Order (DN 109) submitted by the parties and signed by the Court on September 22, 2015.

- Files from Express server matching files on Kapsalis hard drives:  Digital Strata created a file listing report of the Express server in a spreadsheet or database format to compare to a listing report for the Kapsalis hard drives that had previously been produced; on July 30, 2015, the parties were provided with the file listing report for the Express server and a report comparing the file listing report from the Kapsalis hard drives to the one for the Express Server.[3]  Express agreed to produce any files that were found on both the file listing report of the Express server and the file listing report for the Kapsalis hard drives.

- Files from Express server with specific project numbers:  Digital Strata was to perform a search on the Express server for specific five and six digit Vogt Power and Babcock project numbers that had been referred to in files that were saved on the Kapsalis hard drives.[4]  If Digital Strata determined that the search produced an excessive number of irrelevant hits, the parties agreed to meet and confer to determine a procedure to limit the search.  If the search did not return an excessive number of hits, Express would produce the results.

---

[3] As discussed *infra*, plaintiffs now dispute that Digital Strata created a file listing report of the Express server.

[4] It is not clear to the Court whether this search was ever performed.  In the Agreed Order (DN 109), which details the searches that were conducted by Digital Strata, this section is written as if this particular search was to be performed in the future.

- Link file analysis:  Digital Strata performed a link file analysis of the Kapsalis hard drives and any other computers and storage devices that Kapsalis used from April 1, 2013 through May 1, 2014, including "the personal computer desktop and older Vogt laptop described in the deposition of Stephen Kapsalis dated October 6, 2014 . . . ."

- Emails and communications on Express server:  Digital Strata preserved and searched the Express server for emails and other communications through May 1, 2014 to/from the following people or entities:  Larry Vondrak; Paul Cummins; Trey Wills; Mike Gammill; Calpine; Siemens; Fluor; Black & Veatch; and Chicago Bridge & Iron.

(DNs 99, 109.)

The parties also agreed that plaintiffs could provide an initial list of up to five projects/opportunities on which they believed both plaintiffs and Express may have competitively bid or competed; defendants would produce the project files related to these identified projects/opportunities to plaintiffs.  (*Id.*)[5]

One nuance bears mention here.  The proposed Agreed Order (DN 99) stated that Digital Strata would create a "file listing report" for the Express server in a spreadsheet or database format.  (DN 99, p. 2.)  The proposed Agreed Order further stated that the "file listing report of the Express Server will then be compared to the file listing report from any of the Kapsalis hard drives . . . . *The Parties will then be provided with the file listing report for the Express Server* and a report comparing the file listing report from the Kapsalis Hard Drives to the file listing report for the Express Server.  Express agrees to produce any files that are found on both the file

---

[5] Although it does not appear to be at issue, it is not clear to the Court whether plaintiffs ever provided an initial list of projects to defendants or if any projects were produced by defendants.  The Court recognizes that, although the Joint Status Report (DN 349) filed by the parties on August 26, 2016 does not specify so that it may cover some of the project files at issue.

4

listing report for the Express Server and the file listing report from the Kapsalis Hard Drives."
(*Id*. [emphasis added].)  As stated, although the Court did not enter the proposed Agreed Order
(DN 99), the parties jointly submitted a proposed Agreed Order (DN 107), which was entered by
the Court on September 22, 2015; the Agreed Order (DN 109) purported to describe the search
performed by Digital Strata.  The Agreed Order (DN 109) specifically stated:

> The Vendor selected by the Parties *has created a file listing report*
> of the VMWare virtualized email server for live analysis only
> ("Express Server") in a spreadsheet or database format. That file
> listing report of the Express Server was compared to the file listing
> report from any of the Kapsalis hard drives that were previously
> produced on March 25, 2014, May 12, 2014, May 16, 2014 and
> June 2, 2014, comprised of Bates Numbers KAPSALIS 000001 –
> 0300018 (the "Kapsalis Hard Drives"). *On July 30, 2015, the*
> *Parties were provided with the file listing report for the Express*
> *Server* and a report comparing the files listing report from the
> Kapsalis Hard Drives to the file listing report for the Express
> Server.

(DN 109, p. 2 [emphasis added].)  Although the Agreed Order (DN 109) detailing the search
performed by Digital Strata was submitted by *all* of the parties, including plaintiffs, plaintiffs
now dispute that Digital Strata actually created a file listing report for the Express server.  (*See*
DN 242-1, p. 7 ["Digital Strata never created a file listing report of the Express server . . . ."]; *see*
*also* DN 233, pp. 5-6.)  Instead, Digital Strata purportedly created a "Python Program" that
would search for matches of filenames between the Express server and the Kapsalis hard drives
and copy the files that matched.  (DN 233, pp. 5-6; DN 233-2, p. 3.)   However, it appears that,
other than failing to create a separate file listing report for the Express server, the Python
Program created by Digital Strata accomplished the end goal of provision 2.b. of the proposed
Agreed Order (DN 99), *i.e*., the production of files on the Kapsalis hard drives and Express
server that had matching filenames.  (*See* DN 233, pp. 5-6 ["In layman's terms instead of

5

creating a list of all the files on the Express server, Digital Strata wrote a program that looked for matches on the Express server and copied only the file names of the matches – not all of the files['] names."; DN 233-2, p. 3.)  As explained in more detail below, some files were excluded from production by agreement of all the parties.

On July 13, 2015, Dan Fischler, Digital Strata's CEO, sent an e-mail to counsel that included as an attachment the file listing reports for the Kapsalis hard drives; although it is not entirely clear (because the actual attachment is not in the record), it appears that the attachment also included 253,084 "hits" or matches of *filenames* of documents/files that appeared on both the Kapsalis hard drives and the Express server.  (*See* DN 187-8 [July 13, 2015 e-mail from Fischler]; *see also* DN 187-1, p. 4 ["This File Listing Report had 253,084 'hits' of documents and files with matching names."].)  Digital Strata apparently marked with an "x" the items that it believed would be of interest to the parties; it also indicated that the unmarked filenames matched or were "hits," but were likely not of interest.  (*Id.*)

On July 17, 2015, counsel for Kapsalis sent an e-mail to counsel for plaintiffs, suggesting ways to reduce the number of hits "without compromising what we believe to be your [*i.e.*, plaintiffs'] intent with the searches."  (DN 102-3, p. 4.)  Although the Court will not recount that e-mail in detail, counsel for Kapsalis suggested three ways to reduce the number of hits or matches:  (1) eliminate system files from the search returns, *e.g.*, eliminate files with certain extensions such as ".db," ".ico," ".tff," and ".m4a, m4p, wma."; (2) include date limitations for the file listing report contemplated in the 2.b. of the proposed Agreed Order, *e.g.*, limit hits to only the files with a creation or a modified date between April 1, 2013 and May 1, 2014; and (3) ensure true matches, as the search conducted by Digital Strata included as a "hit" every single

6

filename that matched, regardless of whether the metadata was the same, *e.g.*, if a file was called" 2013 budget" it was included as a "hit" even though none of the other data matched.  (*Id.* at 5.)

On July 20, 2015, counsel for plaintiffs responded to each of the three suggestions as follows: (1) agreed to exclude some system files, but not all of the types of files identified by Kapsalis's counsel, and that she would provide a list of system file extensions that plaintiffs would agree to eliminate; (2) would not agree to this limitation; and (3) would not agree to this limitation, recognizing that the search may have resulted in some false positives.  (*Id.* at 4.)  It appears that plaintiffs' counsel subsequently proposed some system file extensions to exclude. (*See* DN 102-3, p. 3.)  And, after some more correspondence, on July 22, 2015, counsel for the parties agreed that Digital Strata would run a filename comparison search again, excluding these file extensions:  ".com," ".css," "Thumbs.db," ".dll," ".exe," ".inf," ".ini," ".thmb," ".js," and ".mui."  (*See* 102-3, p. 2.)  In that same e-mail, counsel for Kapsalis reiterated that "just because a 'hit' appears on the report, does not mean that the hit represents 'documents that were on both Kapsalis' hard drive and Express' server.'  It is just the same name that was on both Kapsalis' hard drive and Express' server, which can be the result of many factors as we have explained in the prior emails trying to exclude the false positives."  (*Id.*)

According to defendants, the limiting factors (*i.e.*, exclusion of certain file extensions) were applied, bringing the matches down to 170,971.  (*See* DN 187-1, p. 5; DNs 187-9, 187-10 [e-mails from Digital Stata indicating a culled file listing].)  Defendants also assert that, on August 3, 2015, Digital Strata produced its "final file listing report comparing the files named on

the Express Server to any file with a matching name on the Kapsalis Devices."  (DN 187-1, p. 7.)[6]

On August 11, 2015, counsel for Kapsalis sent an e-mail to counsel for plaintiffs, among other recipients, indicating that Digital Strata would only be producing the documents marked with an "x" as explained in the July 13, 2015 email (DN 187-8); in response, counsel for plaintiffs stated that she was "fine" with the production of documents marked with an "x."  (DN 244-5, p. 2.)

On August 13, 2015, Digital Strata made the first production to plaintiffs of the documents that according to defendants "matched a [file]name that appeared on both the Kapsalis [hard drives] and Express server."  (DN 187-1, p. 7; DN 187-11.)  Defendants assert that they also informed plaintiffs in a "Joint Status Report" (DN 102-2, pp. 15-16) that a "hit" did not indicate that a document was taken from plaintiffs to Express, only that it shared the same filename as a document that was both on the Kapsalis hard drives and the Express sever. Additional rolling productions were made by Digital Strata on August 20 and 26, 2015 and September 1, 2015.  (*See* DN 187-12.)  In an e-mail dated August 31, 2015, counsel for Kapsalis stated, "We have now finished our review of all of the documents in ESI review with Digital Strata.  The documents are currently being processed and Digital Strata says they will be posted on the FTP by close of business tomorrow (Tuesday) [*i.e.*, September 1, 2015]."  (*Id*. at 2.)

On August 14, 2015 (that is, after the first production of documents on August 13, 2015), Digital Strata sent an e-mail to counsel for Kapsalis; counsel for plaintiffs was not copied on the

---

[6] Defendants cite to "Exhibit I," which is an e-mail from Fischler, in support of this assertion, but the e-mail itself is not clear.  (*See* DN 187-10.)  The e-mail simply states, "Here are the updated spreadsheets suppressing all items before 2000."  (*Id*.)  The Court believes that "Exhibit J" or DN 187-11, p. 5, might be the appropriate citation. Nonetheless, this does not appear to be a point of disagreement between the parties.

e-mail.  (*See* DN 233-3, p. 4.)  In the August 14 e-mail, Digital Strata indicated that "[o]ne of the files that was identified as being in both the Kapsalis images and on the Express server was 'backup.pst'.  The file contains ~8000 email messages.  The file lives at C:\backup.pst in Kapsalis images OSDO8426-03.E01 and OSD08426-03_11-09-2013.E01.  Though it has a last accessed datestamp of 2012-04-27, the file was created and last modified on 2008-10-06, so it's pretty old." (*Id*.)  The August 14 e-mail indicated that there were multiple hits for that filename on the Express server; the August 14 e-mail also indicated that "admittedly, it's pretty generic." (*Id*.)  In response, Kapalis's counsel stated that she was "not sure I entirely follow all of this – maybe best to talk it through?" (*Id*. at 3.)  In response, Digital Strata sent an e-mail that stated, in part, "The upshot is that the file hit on the file name, not the content of it." (*Id*.)  In response, counsel for Kapsalis stated that she still needed to better understand the situation "before agreeing." (*Id*. at 2.)  As a result, it appears that a phone conference was held between an employee with Digital Strata and counsel for Kapsalis regarding whether the documents contained in the "backup.pst" file should be produced:  according to defendants, counsel for Kapsalis simply asked if the "backup.pst" file had been marked with an "x" and, if so, all documents contained within it should be produced pursuant to the proposed Agreed Order.  (DN 244, p. 8.)  On the same day, Digital Strata sent an e-mail to counsel for Kapsalis that confirmed that the "backup.pst" file was definitely in the "x" category (*i.e.*, the items that, according to Digital Strata's July 13, 2015 e-mail, were going to be produced); the e-mail also indicated that the data would therefore be exported and made available for review.  (*Id*. at 2; *see also* DN 187-8 [July 13, 2015 e-mail from Digital Strata].)  Consequently, the documents contained in the "backup.pst" filename were produced to plaintiffs.[7]

---

[7] In the Motion for Fees, plaintiffs explain to the Court that a ".pst file is essentially a folder that contains files

On September 22, 2015, the Court entered the Agreed Order (DN 109) regarding the search conducted by Digital Strata that had been jointly submitted by the parties.  DN 109 stated, among other things, that Digital Strata had created a list of the identified documents, with the list showing the name of the document, the creation date of the document, the last modified date of the document, the creator of the document, any recipients of the document and the search terms that identified the document.  (*Id*. at 3.)  The list was provided to the parties' counsel and their information technology vendors on July 30, 2015.  (*Id*.)  The list of identified documents was reviewed by defendants' counsel for privilege.  (*Id*.)  All documents that were not withheld on the basis of privilege were provided to counsel for plaintiffs and their information technology vendor, subject to the provisions of the Agreed Protective and Confidentiality Order (DN 37) previously entered by the Court on January 13, 2014 as follows:  defendants' ESI Review 1-11943 were produced on August 13, 2015; defendants' ESI Review 11944-27601 were produced on August 20, 2015; defendants' ESI Review 27602-40153 were produced on August 26, 2015; and defendants' ESI Review 40154-172378 were produced on September 1, 2015.  (DN 109, p. 3.)

On December 3, 2015, the Court held a hearing on various motions.  During that hearing, plaintiffs' counsel stated, "We were delivered 100,000 pages of documents that were taken by Steve Kapsalis and *stored on Express's server*."  (DN 151, p. 18 [emphasis added].)  However, counsel for Kapsalis expressed skepticism that the 100,000 pages that were delivered by the third party vendor (*i.e*., Digital Strata) were actually all from the Express server.  (*Id*. at 21-22, 50.)

within it"; plaintiffs further state that the ".pst file in issue here was named 'backup.pst' which was bound to have a matching name" on the Kapsalis hard drives because "virtually all computers have backup.pst files."  (DN 242-1, p. 7 n.2.)  In another brief, plaintiffs also stated that a ".pst file is a compound file, meaning it contains multiple additional files inside."  (DN 233, p. 6.)

Plaintiffs' counsel stated that the 100,000 pages were culled down to about 860 documents, or 10,000 pages; it appears that plaintiffs allege the 860 documents constitute their trade secrets. (*Id*. at 18-23.)  Plaintiffs' counsel also observed that the search conducted by Digital Strata was only for "identical file names."  (*Id*. at 24); she then stated, "So if Kapsalis took information, pulled it, cut it and pasted from our documents and it ended up on Express's server with a different file name, then we wouldn't know that unless we do some additional checking with regard to the metadata on the documents that we have identified that are currently resident on Express's server."  (*Id*.)  During the hearing, there appeared to be some confusion about the source of the documents produced by Digital Strata, that is, whether the produced documents came from the Express server or the Kapsalis hard drives; consequently, the Court informed the parties that it was going to direct them to contact Digital Strata to ascertain the original location of the documents that were produced.  (*Id*. at 51-52.)  Accordingly, on December 11, 2015, the Court ordered the parties to jointly contact Digital Strata "to ascertain where the documents identified by it were originally located or found."  (DN 150, p. 2.)  The parties were to file a joint report regarding this issue by January 5, 2016.  (*Id*.)

On December 17, 2015, a Digital Strata employee sent an e-mail that apparently included a spreadsheet (which does not appear to have been provided to the Court) that described the source of 852 files:  files 2-787 were from a Kapsalis hard drive and files 788-853 were from the Express server.  (*Id*. at 187-13.)   According to plaintiffs, these documents consisted of approximately only 30,000 pages of the original 170,000 page production.  It appears that, based on an e-mail from Kapsalis's counsel to plaintiffs' counsel, this spreadsheet *only* identified the

source of the documents that had been identified by plaintiffs as potential trade secrets.[8]  (DN 159-2, p. 1.)

On January 3, 2016, plaintiffs filed a motion for an extension of the January 5, 2016 deadline to provide a joint report regarding the source of the documents produced by Digital Strata.  Specifically, plaintiffs asserted that the Bates numbers in the spreadsheet provided by Digital Strata did not match the Bates numbers for the same documents produced to plaintiffs in August and September of 2015.[9]  (DN 159, p. 2.)  Additionally, plaintiffs disagreed with defendants that the Court ordered the sourcing of only the approximately 860 documents referenced in the declarations of Christopher Turner and Andy Allen; instead, plaintiffs believed that the Court ordered the parties to ascertain the source of *all* of the documents produced by Digital Strata.  (*Id.* at 3.)  The Court later clarified that the parties should work with Digital Strata to obtain the source of all documents produced as a result of the searches detailed in the Agreed Order (DN 99).  (*See* DN 170.)

On January 19, 2016, defendants submitted an e-mail from and report prepared by Digital Strata.  (*See* DN 175 with attachments.)  In a January 18, 2016 e-mail, Digital Strata stated that the attached spreadsheets covered all documents (*i.e.*, 21,730 files) produced and the files came from a total of four source locations:  Express Group File Server (11,797 files); Express Group Mail Server (1,063 files); Kapsalis' Devices (*i.e.*, Kapsalis hard drives) (419 files); and "backup.pst" file (8,452 files).  (DN 176-1, p. 2.)  The January 18 e-mail also stated that each

---

[8] At the December 3, 2015 hearing, plaintiffs' counsel stated that the "most sufficient description of the trade secrets" was contained in the declarations of Christopher Turner and Andrew Allen.  (DN 151, p. 27.)  The declarations of Turner and Allen state that they reviewed approximately 860 documents that were taken by Kapsalis from Vogt Power.  (DN 144, p. 1, 4; DN 154, p. 1.)  The Court assumes that Digital Strata identified the source of these documents.

[9] In his deposition, Fischler testified that the Bates numbers for the second production of documents were erroneously assigned to the third production of documents.  (DN 233-2, p. 4.)

spreadsheet had a column for "BAD BEGBATES" and "GOOD BEGBATES" to indicate the erroneous Bates-numbers that should be replaced by the correct Bates-numbers. (*Id*. at 2.) With respect to the spreadsheet for the "backup.pst" files, the January 18 e-mail stated, "[W]e have included 3 columns (Express Group File Server, Express Group Mail Server, and Kapsalis Devices). If a matching file name was found on one of these three sources, the BEGDOC # of the matching file is indicated. If no value is present, no matching file was identified on that source." (*Id*. at 2.)

On January 29, 2016, Digital Strata sent an e-mail to all counsel regarding an additional analysis of the "764 documents delineated within the PDF file named 'Plaintiff's Disc. of Trade Secrets.'" (DN 187-14, p. 2.) The January 29 e-mail stated that the purpose of the analysis "was to determine if the same document content was on both the Express File and/or Mail Server and a Kapsalis device." (*Id*.) The January 29 e-mail stated, "This analysis included by filename, MD5 hash and near duplicate." (*Id*.) The January 29 e-mail stated that none of the 764 documents identified by plaintiffs was found on the Express Group File server or Express Mail Server. (*Id*.) The January 29 e-mail also stated that the attached spreadsheet also included a "cross-reference for the 'Good BEGBATES' and 'BAD BEGBATES' for the affected files." (*Id*.)

Plaintiffs claim that defendants' assertion that the 764 documents that plaintiffs identified as trade secrets were not found to be present on the Express servers is incorrect. Plaintiffs point back to the production of the documents contained in the "backup.pst" file. (DN 233, p. 6.) Plaintiffs assert that Digital Strata did not extract the approximately 8,000 files contained in the "backup.pst" file before performing the filename comparison to identify filename matches on the

Kapsalis hard drives and Express server.  (DN 233, p. 6.)  Plaintiffs argue that this caused a problem when Digital Strata later attempted to identify whether those 8,000 files were on the Express server.  (DN 233, p. 6.)   According to plaintiffs, the 764 documents identified by plaintiffs as trade secrets were all part of the 8,000 files contained in the "backup.pst file" and that "no search for these file names was ever done"; as a result, plaintiffs argue that defendants and Digital Strata cannot state with any certainty that the documents identified as trade secrets were not located on the Express Server.

Plaintiffs cite to a portion of Fischler's deposition in support of their assertion; the Court has included additional portions that it believes are relevant:

> Q.· And then I believe -- oh, you asked Nick for a file comparison, and I believe you asked if ·any of these files -- if any of the content  files appeared on the Express Server.· Those ·are the next two e-mails and then your final e-mail is, "Good, I think we're covered with expecting no hits," smiley face.· Do you see that?
>
> A.· Uh-huh.
>
> Q.· What did you mean by that?
>
> A.· I think when we compared the contents of that PST against the files we previously collected, we compared the file names, I would have been surprised if there had been hits, not saying there couldn't have been, but...
>
> Q. So were you able to compare the contents of that PST file to the [Express] file server as a whole?
>
> A. *No, just to what we had previously collected.*
>
> Q. So if you wanted to compare the contents of that PST file to the Express Server as a whole, you would need to go back and run the Python script again?
>
> A. Correct.

14

(DN 233-2, p. 11 [emphasis added].)[10]  This deposition testimony is based on e-mails between Digital Strata employees dated January 6, 2015 in which they discussed what appears to be a search for the files contained in the "backup.pst" file on the Express server; one employee stated, "I modified the original script that I ran, and it did not come back with any hits . . . . Using a new script, I ran that unique filename list against my original CSV Express server listings.  No hits there either."  (DN 233-8, p. 3.)  Thus, the Court does not interpret Fischler's deposition testimony as indicating that *no* search for the files included in the "backup.pst" file was done, only that the search was conducted in the files that Digital Strata had "previously collected." The Court is unsure what "previously collected" means in this context; it assumes that, based on the e-mail described above and Fischler's deposition testimony, the search was run against files that had already been identified as containing matches in conjunction with the original search of the Express server by Digital Strata, including the "backup.pst" file.  (*See* 266-1, p. 5 [testimony from Fischler that Digital Strata copied any file from the Express server that matched a filename on the seven [Kapsalis hard drive] devices].)  However, Fischler also agreed that if one wanted to "compare the contents of th[e] PST file to the Express server as a whole," one would need to run the Python script (*i.e.*, Python Program) again.  (*Id*. at 6.)

On February 5, 2016, plaintiffs sent a letter to Digital Strata requesting that it stop work on the project immediately.  (DN 233-1.)  Therefore, the Court believes that the January 29, 2016 e-mail sent by Digital Strata to all counsel regarding the additional analysis of the 764 documents identified by plaintiffs as trade secrets was the last piece of substantial work

---

[10] The Court notes that in the brief supporting the Motion for Fees, plaintiffs recount deposition testimony from Fischler indicating that he understands that only Express was to produce documents, not Kapsalis.  (DN 242-1, p. 4.) While the significance of this testimony may become clear to the Court in the future, plaintiffs have not made it sufficiently clear here.

15

completed by Digital Strata with respect to the searches and production of documents pursuant to the Agreed Order (DN 109) and subsequent Order (DN 150) directing the parties to jointly contact Digital Strata to source the produced documents.  (*See* DN 187-14, p. 1.)

### B.    Brief Summary of the Parties' Arguments

#### 1.    Plaintiffs' Motion for Fees

Plaintiffs aver that the purpose of the searches conducted by Digital Strata was to determine whether Kapsalis transferred any of their documents to the Express server.  (DN 242-1, pp. 3, 7.)  Plaintiffs further aver that "Defendants and Middleton [Reutlinger][11] caused Plaintiffs to unnecessarily incur tens of thousands of dollars by hijacking the discovery process set forth in the Agreed Order."[12]  (*Id*. at 1.)  First, plaintiffs assert that defendants' counsel and the law firm of Middleton Reutlinger entered into an independent relationship with Digital Strata, which compromised Digital Strata's neutrality.  (*Id*. at 4-6, 12.)  Second, plaintiffs argue that decisions made by defendants' counsel and Digital Strata during ex parte communications resulted in a document production that consisted of thousands of pages that were outside the scope of the "Agreed Order."  (*Id*. at 7-8.)  Third, plaintiffs allege that Digital Strata produced thousands of pages of incorrectly Bates-numbered documents to them, and defendants failed to inform them.  (*Id*.)  Fourth, plaintiffs allege that defendants produced 170,000 pages of documents which they misrepresented "with regard to whether the *file names* in question

---

[11] Middleton Reutlinger is the law firm that employs counsel for Kapsalis and former counsel for Express.

[12] Plaintiffs assert that defendants violated the proposed Agreed Order (DN 99).  (DN 242-1, p. 1 [requesting an order granting attorneys' fees to them for the "time Plaintiffs incurred unnecessarily reviewing documents improperly produced in violation of the Agreed Order, dated June 3, 2015 (the 'Agreed Order') (Dkt.No. 99) . . . ."].)  The Court assumes that plaintiffs are actually asserting that defendants violated the *entered* Agreed Order (DN 109) as the proposed Agreed Order (DN 99) was never entered by the Court.  The Court notes that, while the proposed Agreed Order (DN 99) and Agreed Order (DN 109) are similar, they are not identical.

appeared on both the Express server and the Kapsalis devices, requiring Plaintiffs to waste tens of thousands of dollars reviewing documents whose *filenames*[13] they now claim are not on the Express server." (*Id*. at 2, 11 (emphasis added).)  As a result, plaintiffs argue that, under Rules 16(f) and 37(b) of the Federal Rules of Civil Procedure, they are entitled to attorneys' fees and costs that were incurred in reviewing unnecessary documents, having their forensic expert analyze same, taking the deposition of Fischler, defending against defendants' motions, and bringing the Motion for Fees.  (*Id*. at 10, 14.)  Plaintiffs further argue that they are entitled to attorneys' fees even if the conduct on behalf of defendants and their attorneys was merely negligent.  Plaintiffs also cite 28 U.S.C. § 1927 in support of the Motion for Fees.  Finally, in addition to their request for fees, plaintiffs request that the Court require Express to perform additional searches of its server.  (*Id*. at 16.)

### 2.    Defendants' response

In response, defendants first argue that plaintiffs cannot establish that defendants or Middleton Reutlinger caused the alleged overproduction of non-responsive documents and/or incorrectly Bates-numbered documents.  (DN 259, p. 5.)   With respect to the production of allegedly non-responsive documents, defendants claim that the documents contained within the "backup.pst" file were explicitly required to be produced under the terms of the Agreed Order (DN 109), and that plaintiffs specifically consented to the production of the documents after having been given the opportunity to consult with Digital Strata regarding any questions or concerns about the specific documents that would be produced.  (*Id*. at 5-6.)  Defendants further argue that because plaintiffs consented to producing the "backup.pst" file that was marked with an "x" on the file listing report provided by Digital Strata, neither defendants nor Middleton

---

[13] The Court notes that "filename" and "file name" appear to both be recognized as acceptable spellings.

Reutlinger had any reason to believe that plaintiffs would not want Digital Strata to produce the documents contained in the "backup.pst" file. (*Id*. at 8.)   Furthermore, defendants argue that the expert report of Andy Cobb establishes that none of the files or documents contained in the "backup.pst" file was on the Express Server; therefore, despite any issues with the initial analysis by Digital Strata, there is no reason to conduct any additional searches of the Express server. (*Id*. at 16-17.)

With respect to the incorrectly Bates-numbered documents, defendants state that plaintiffs have not established any basis for their allegation that defendants or Middleton Reutlinger deliberately failed to inform plaintiffs about the incorrectly Bates-numbered documents.  Defendants also assert that there was nothing improper about their relationship with Digital Strata; rather, the only improprieties identified by plaintiffs are that Middleton Reutlinger used Digital Strata's review platform to conduct its privilege review of the documents produced by Digital Strata and engaged in ex parte communications with Digital Strata during the several months when Digital Strata conducted its analysis. (*Id*. at 9, n.11)  Defendants state that these actions were not prohibited by the Agreed Order (DN 109).  Therefore, defendants argue that plaintiffs are not entitled to attorneys' fees under Rule 37 or 28 U.S.C. § 1927.

### 3.    Plaintiffs' reply

Plaintiffs' reply touches on several different topics.  First, plaintiffs argue that Digital Strata never created a file listing report for the Express server; instead, Digital Strata created a Python Program which would look for filename matches between the Express server and the Kapsalis hard drives.  (DN 266, p. 1.)  Plaintiffs claim that this is an issue because the file listing reports for the Kapsalis hard drives included the "backup.pst" file. (*Id*. at 2.)  Digital Strata did

not extract the multiple files contained within the "backup.pst" file before performing the filename comparison; thus, according to plaintiffs, this led to the production of 170,000 pages to plaintiffs when only 30,000 or so were on the Express server.  (*Id.*)  That is, all of the files included in the "backup.pst" file were produced to plaintiffs.  (*Id.*)  Plaintiffs state that they are not taking issue with any "false positives" that the search conducted by Digital Strat rendered, only with Digital Strata's failure to extract the files contained in the "backup.pst" file, which they claim would be standard industry practice.  (*Id.* at 2-5.)

Second, plaintiffs take issue with the "thousands of pages" of ex parte e-mail communications that Kapsalis's counsel had with Digital Strata.   They cite to two specific examples of allegedly inappropriate conduct in this regard:  one, the ex parte conversation/e-mail with Digital Strata regarding the "backup.pst" file, and two, an e-mail that plaintiffs claim shows that Kapsalis's counsel "directed the over production of irrelevant documents to Plaintiffs."  (*Id.* at 5.)[14]

Finally, plaintiffs claim that Cobb can only speak to whether the 760 files (*i.e.*, their trade secrets) that he referenced in his report were on the Express server in April 2016, and that he could not say whether those files existed on the Express server in the past; plaintiffs also argue that Cobb was unable to determine whether any of those 760 files had been modified.  (*Id.* at 10-13).[15]

---

[14] Plaintiffs also throw in an argument with respect to Defendants' Motion for Protective Order (DNs 219, 233), which the Court will address in a separate memorandum opinion and order.

[15] Plaintiffs also state, "Dr. Cobb's report only concerned documents with the 'Defendants' ESI' Bates numbers – which is not all inclusive of Plaintiffs' trade secrets.  He performed no search for documents identified as trade secrets with the 'KAPSALIS' Bates numbers, which number in the thousands." (DN 266, p. 9.)  Plaintiff does not explain  what this means or implies.  The Court will note that Dr. Cobb testified that he did not need the Bates numbers to run an analysis on documents, only the hash value.  (DN 266-5, p. 6.)

## II.     DISCUSSION

Rule 16(f) states, "On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1).  With respect to imposing fees and costs, Rule 16(f) states, "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  *Id.* at (f)(2).  Rule 37(b) also permits the payment of expenses, including attorneys' fees, for a party's failure to "obey an order to provide or permit discovery" unless the "failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b).

Although there are myriad tangential issues, plaintiffs' request for attorneys' fees boils down to what they allege is a violation by defendants of the Agreed Order (DN 109).  That is, plaintiffs claim that they are entitled to attorneys' fees for reviewing unnecessary documents, having their forensic expert analyze same, taking the deposition of Fischler, defending against defendants' motions, and bringing the Motion for Fees.[16]  Based on what the Court understands has occurred with respect to Agreed Order (DN 109), an award of attorneys' fees is not appropriate in this situation.  This is because, under the circumstances, such an award would be unjust.  The Court will not discuss every single reason why an award would be inappropriate here; however, it will attempt to dispel some of the arguments proffered by both plaintiffs and

---

[16] Plaintiffs allege that Digital Strata is a de facto agent of defendants and that "[g]iven the conduct of Digital Strata and its relationship with Middleton [Reutlinger], it is and should be treated as a party."  (*See* DN 242-1, pp. 2, 10 n.4.)  Plaintiffs, however, do not offer any case law in support of their assertion.

defendants – some of which amounts to obfuscation – to show why an award would not be warranted in this instance.

As an initial matter, the Court notes that it could point out missteps by every party involved in the search and production of documents described in this memorandum opinion and order. While hindsight is 20/20, the parties have no one to blame but themselves for the way in which the proposed Agreed Order (DN 99) or Agreed Order (DN 109) were worded or the searches designed and for any carelessness in choice of words. In other words, there is plenty of blame to go around; therefore, an award of fees to one side over the other would not be just. The Court will now turn to some of the specific contentions raised by the parties in the briefing related to the Motion for Fees.

First, the Court expressly rejects any suggestion by defendants that plaintiffs should be held solely responsible for the way searches were conducted pursuant to the proposed Agreed Order (DN 99) because plaintiffs drafted it; on the contrary, the proposed Agreed Order (DN 99) – as well as the entered Agreed Order (DN 109) – was *jointly* submitted by the parties. Plaintiffs now claim that Digital Strata failed to compile a file listing report for the Express server when they, along with defendants, jointly submitted another proposed Agreed Order (DN 107) that was later entered by the Court (DN 109); that Agreed Order (DN 109) stated that the "Vendor selected by the Parties *has created* a file listing report of the VMWare virtualized email server for live analysis only ("Express Server") in a spreadsheet or database format." (*See* DN 109, p. 2.) In other words, plaintiffs signed a proposed Agreed Order (DN 107) that purported to state exactly the opposite of what they are claiming now. The Court understands that plaintiffs likely assumed that Digital Strata had created a file listing report because that is what they thought had

21

occurred.  But this is an example of the type of loose language that has permeated the filings in this matter on the part of both sides.

Second, with respect to Digital Strata's failure to create a file listing report for the Express server, the Court does not see – at least based on what plaintiffs have presented – how this made a difference in the outcome.  That is, plaintiffs have not produced any clear proof (or even argument) to the Court that, had Digital Express created a file listing report for the Express server, the "backup.pst" file would not have been produced or that this dispute would not have arisen.  Plaintiffs do not appear to dispute that the Python Program developed by Digital Strata accomplished the end goal of that provision of the Agreed Order (DN 109), which was to find (and copy) the matching filenames on the Express server and Kapsalis hard drives.  The Court realizes that the "backup.pst" file was included as a match, but at least as this juncture, plaintiffs have not shown the Court how this could have been avoided if Digital Strata had created a file listing report for the Express server.

Third, the Court understands that one of plaintiffs' main contentions is the production of the "backup.pst" file.  The Court makes several observations with respect to this issue.  One, the parties' computer experts were apparently looped into the search process from the beginning. (*See* DN 266-3, p. 8 [e-mail from Kapsalis's counsel regarding the draft proposed Agreed Order copying the parties' IT experts, Lacey Walker and Jason Hale].)  Moreover, plaintiffs agreed that all files marked with an "x" on the final file listing report that compared the filenames on the Express server with any matching filename on the Kapsalis hard drives should be produced; that final file listing report apparently marked the "backup.pst" file with an "x."  Plaintiffs now claim that the "backup.pst" file should not have been included in the production.  Plaintiffs

22

simultaneously argue that it should have been known that "virtually all computers have backup.pst files" and therefore there was bound to be a matching name on the Kapsalis hard drives.   (DN 242-1, p. 7 n.2.)   Plaintiffs also argue that the Agreed Order (DN 109) "contemplated that communications between Digital Strata would be made by each parties' **computer consultant**—not the attorneys." (*Id.* at 15.)   Therefore, there was no reason why plaintiffs' computer expert, Walker, could not have reviewed the final file listing report which included the "x" for the "backup.pst" file and communicated with plaintiffs or Digital Strata regarding any potential issues that may have arisen as a result.   If this was as obvious as plaintiffs now claim, it should have been equally apparent at that time as well.   Additionally, Kapsalis's counsel (and/or Digital Strata) should have communicated with plaintiffs' counsel regarding the "backup.pst" file after being contacted by Digital Strata regarding the issue.   Just as plaintiffs likely assumed that Digital Strata had created a file listing report for the Express server (because that is what the Agreed Order contemplated), it appears that Kapsalis's counsel assumed that because the "backup.pst" file had been indicated as a matching file name and marked with an "x," plaintiffs would want it to be produced (because plaintiffs expressly assented to everything marked with an "x" being produced).   Finally, it is still not entirely clear to the Court what exactly happened with respect to a comparison of the actual files contained in the "backup.pst" file on the Express server and the Kapsalis hard drives; the only conclusion that the Court can draw from Cobb's testimony is that the approximately 760 documents that plaintiffs have identified as trade secrets were not on Express's server in April 2016.

Fourth, plaintiffs complain of two instances of allegedly improper ex parte communications between Digital Strata and Kapsalis's counsel: the conversation between

Kapsalis's counsel and Digital Strata regarding the "backup.pst" file, which the Court has already discussed, and an August 26, 2016 e-mail from Kapsalis's counsel to a Digital Strata employee (DN 266-2).  Plaintiffs assert that this e-mail shows that "it is clear that counsel for Defendants not only knew about, they *directed* the over production of irrelevant documents to Plaintiffs."  (DN 266, p. 5.)  Specifically, plaintiffs claim that the e-mail was "relating to the production of obviously irrelevant music and non-office files."  (*Id*.; DN 266-2, p. 21.)  The August 26 e-mail from Kapsalis's counsel at issue states, in part, "Also let's go ahead and produce the non-office files (music, system files, etc.) from Express since the review will take longer than the 612 would have.  And yes, please feel free to put on a FTP site and also send to the retained expert, Lacey Walker."  (DN 266-2, p. 21.)  As the Court recounted in the background section, Kapsalis's counsel proposed that the certain system files be eliminated from the search, including ".m4a, m4p, wma." (*i.e.*, audio) files.  Plaintiffs did not agree to eliminate all of the system files proposed for elimination, including the ".m4a, m4p, wma." files; consequently, the ".m4a, m4p, wma." files, along other system files, were apparently included in the production to plaintiffs.  Therefore, the Court does not interpret this e-mail as plaintiffs do, as it appears that plaintiffs *wanted* audio files and other system files (other than the ones that plaintiffs specifically agreed to exclude) included in the production.  Indeed, the e-mail could be interpreted as Kapsalis's counsel directing the production of additional responsive documents to plaintiffs in order to give plaintiffs more time to review them in light of the volume.  Accordingly, the alleged ex parte communications do not support the instant Motion for Fees.

Fifth, plaintiffs have taken issue with defendants utilizing Digital Strata's privilege review platform to review the production of documents in August 2015 without notifying

plaintiffs of same until December 2015.  (*See, e.g.*, DN 233, pp. 12-13.)  Again, it would have been wise to have obtained plaintiffs' counsel consent or at least explicitly informed them.[17]  However, the Court finds no sanctionable conduct given the enormous gray areas in the search and production of documents by Digital Strata.[18]

Sixth, whether purposeful or not, from what the Court understands has occurred, the search and production of documents pursuant to the proposed Agreed Order (DN 99) and Agreed Order (DN 109) has been misconstrued on several levels.   Therefore, the Court cautions the parties to be careful and concise when relaying what has transpired.  The Court understands that the search of the Kapsalis hard drive and Express server pursuant to 2.b. of the proposed Agreed Order (DN 99)/Agreed Order (DN 109) was a search for matching *filenames*.  This means that *only* the filenames matched, not necessarily the content of files themselves.  In other words, the content of the files could have been the same or it could have been different.  As a result, the production of a document pursuant to the Agreed Order with a matching filename did not necessarily mean that that same document existed on both the Kapsalis hard drives and the

---

[17] While Kapsalis's counsel did not expressly state that defendants were using Digital Strata's privilege review program, in an e-mail dated August 31, 2015, she did state, "We have now finished our review of all of the documents *in ESI review with Digital Strata*."  (DN 187-12, p. 2 [emphasis added].)

[18] Notwithstanding the foregoing, the Court *is* concerned about the relationship between Digital Strata on the one hand and defendants and its lawyers on the other.  Specifically, defendants' admission that "Middleton used Digital Strata's review platform to conduct its privilege review of the documents produced by Digital Strata and engaged in limited *ex parte* communications with Digital Strata over the several months during which Digital Strata conducted its analysis. . ." is troubling.  It is not at all clear to the Court what it means for Middleton to have "used Digital Strata's review platform."  This could mean on one extreme that defendants purchased and used a Digital Strata product available to anyone, or on the other extreme that defendants hired Digital Strata to act as an expert for defendants at cross purposes to plaintiffs, or something else entirely in between.  Furthermore, defendants' argument (DN 259, p. 9) that the *ex parte* communications were not barred by the terms of the Agreed Order (DN 109) is a legitimate argument against the instant Motion for Fees, as that motion sounds in an alleged violation of the Agreed Order.  However, that does not mean the communications were otherwise proper in the broader sense.  Nor is the Court prepared to overlook otherwise improper *ex parte* communications on the basis that they were "limited."  (*Id.*)  For the reasons stated, the Court does not believe that the allegedly improper communications bear on the instant Motion for Fees, but does not consider the issue of such communications to be closed.

Express server.[19]  For example, from what the Court understands, a file named "Confidential Documents" could have existed on both the Kapsalis hard drives and the Express server and been produced as a match, but the *content* of the file named, "Confidential Documents" on a Kapsalis hard drive could have been different than the content of a file named, "Confidential Documents" on the Express server; conversely, the content could have been exactly the same.  If the purpose of the search conducted pursuant to the proposed Agreed Order (DN 99)/Agreed Order (DN 109) was to determine whether the content of documents on the Kapsalis hard drives and Express server matched, or whether one part of a document on the Kapsalis hard drives was copied and pasted into a document on the Express server, it should have been drafted differently or, at a minimum, more clearly, especially given that the parties' *computer experts* were apparently involved in the process from the beginning.

Seventh, it appears to be undisputed that Digital Strata erroneously Bates-labeled some documents that were produced to plaintiffs.  Plaintiffs state that Digital Strata made counsel for defendants aware of the issue, but that Digital Strata did not inform plaintiffs' counsel about the mistake.  (DN 233, p. 14.)  Plaintiffs appear to blame defendants' counsel for not informing them of the erroneously Bates-labeled documents as well.  The Court does not have enough information before it to say whether defendants' counsel was required to inform plaintiffs'

---

[19]  The Court is particularly disturbed with plaintiffs' assertion that defendants "produced 170,000 pages of documents which they *misrepresented with regard to whether the file names in question appeared on both the Express server and Kapsalis* [hard drives] . . . ."  (DN 242-1, p. 2 [emphasis added].)  At the December 3, 2015 hearing, plaintiffs' counsel also stated, "We were delivered 100,000 pages of documents that *were taken by Steve Kapsalis and stored on Express's server*."  (DN 151, p. 18 [emphasis added].)  While there was no doubt some confusion related to the actual production of documents as evidenced at the December 3, 2015 hearing, the proposed Agreed Order (DN 99) specifically stated that Express was "to produce any files that are found *on both* the file listing report for the Express Server and the file listing report from the Kapsalis Hard Drives"; it was not limited only to files that existed on the Express server.  (DN 99, p. 2.)  Moreover, at least from what the Court has been presented, Kapsalis's counsel informed plaintiffs' counsel on several occasions that a filename match did not necessarily mean that the *same documents* existed on both the Express server and Kapsalis hard drives.

counsel of this error; certainly, it would have been wise on the part of defendants' counsel and certainly by Digital Strata. And, the Court understands plaintiffs' justifiable frustration. Nonetheless, this boils down to what appears to be poor communication and perhaps a billing issue that plaintiffs should take up with Digital Strata – not sanctionable conduct.

Eighth, 28 U.S.C. § 1927 states, "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." For the reasons already discussed – including the fact that *all* parties involved bear a share of the responsibility for what happened – the Court does not believe that this statute justifies an award of attorneys' fees to plaintiffs under the circumstances of this dispute.

Ninth, plaintiffs rely on *Procaps, S.A. v. Patheon, Inc*., Case No. 12-24356-CIV-GOODMAN (S.D. Fla. June 2, 2014), in the record at DN 242-11, for the proposition that defendants should be held responsible for plaintiffs' attorneys' fees "even in the absence of wrongdoing whatsoever." (DN 242-1, p. 13.) Plaintiffs assert that the Magistrate Judge in *Procaps* emphasized that the award of attorneys' fees was not punitive but rather based on the principle of personal responsibility. (*Id*. at 14.) *Procaps* is not binding on the Court, and the undersigned does not find it helpful in this situation. For one, the facts are not similar enough to the ones at hand to be useful. The fundamental issue in *Procaps* was a *pre-existing* conflict of interest on the part of the allegedly neutral, third-party ESI vendor retained by plaintiff – a conflict of interest that the Magistrate Judge determined defendant, defendant's counsel, and/or the ESI vendor should have discovered. The Magistrate Judge in *Procaps* stated, "As Federal

Rule of Civil Procedure 37(a)(5) provides, responsibility for attorney's fees as expenses does not necessarily mean that [the defendant or defendant's counsel] violated any statute, rule, or guideline, nor does it mean that they did anything wrong.  Instead, it simply means that [the defendant and defendant's counsel] did things which ultimately resulted in unnecessary expense – which, in the specific circumstances here, is attorney's fees.  Phrased differently, [the defendant and defendant's counsel] are responsible for the consequences of their actions."  (DN 242-11, p. 11.)  In short, the language in *Procaps* stating that a party is responsible for the consequences of its actions could apply equally to *all* parties involved in this dispute.

Tenth, the Motion for Fees is not the appropriate vehicle to request an additional search of the Express server; nor could the Court, without more information, craft the terms of an additional search at this juncture, even if one were warranted.

Finally, the undersigned does not intend to either chastise or elevate any one party or attorney over the others in this matter.   It is hardly remarkable that misunderstandings occurred in communications involving multiple lawyers and multiple computer experts, especially in light of the underlying friction between the parties and, at times, their counsel.  It is equally unremarkable that the poor choice of wording in the proposed Agreed Order (DN 99) and Agreed Order (DN 109) did not become apparent until after the search was completed. However, the instant agreement is not an isolated incident.  The Court implores *all* parties to be concise, clear, and forthright with not only the Court, but with each other, in the future.  In fact, Rule 11 mandates it.  Fed. R. Civ. P. 11 (b) ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the

factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .")

## III.     CONCLUSION

Accordingly,

IT IS ORDERED that the Motion for Fees (DN 242) is DENIED.


cc:  Counsel of record

29