UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


BABCOCK POWER, INC., et al.                                    PLAINTIFFS


v.                                                          3:13-CV-717-CRS


STEPHEN T. KAPSALIS, et al.                                    DEFENDANTS


## MEMORANDUM OPINION


This matter is before the court for consideration of two motions of the defendant, Stephen

T. Kapsalis ("Kapsalis"), for summary judgment on all claims against him (DNs 119, 281).  He

urges that the plaintiffs, Babcock Power, Inc. (also referred to as "BPI") and Vogt Power

International, Inc.  (collectively referred to as "Vogt," unless individual designation is otherwise

required), have failed to adduce evidence that they suffered damages as a result of any of the

alleged wrongful acts of the defendants (DN 119), and that even if damages evidence was

adduced, Vogt cannot establish the remaining elements of its claims.  Kapsalis also alleges that

Vogt has failed to identify its alleged trade secrets with specificity (DN 281).[1]  The court also has

before it a motion to hold Kapsalis in contempt of court for purported violations of a preliminary

injunction put into place by Judge John G. Heyburn II on December 23, 2013.   (DN 143).

---

[1] Defendant Express Group Holdings LLC ("Express") filed for Chapter 7 bankruptcy.  Thus this matter is stayed as
to Express.

Magistrate Judge Collin H. Lindsay held an evidentiary hearing on the issue of contempt, and the parties filed proposed findings of fact and conclusions of law addressing the issue. This court determined that these matters should be considered in conjunction with one another, in the interest of judicial economy.

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the moving party has the burden—the plaintiff on a claim for relief or defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotations and emphasis omitted).

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

As an initial matter, the court also notes that the parties cite Kentucky law on substantive issues uniformly as to the issues raised in the pending motions.[2] The parties have not addressed the choice of law provision in the Babcock Power Inc. Employee Non-Disclosure, Non-

---

[2]Kapsalis cites a number of cases from other states such as Georgia, California, and Arizona as illustrative, for purposes of addressing Kentucky's Uniform Trade Secrets Act.

Solicitation, Non-Competition and Assignment Agreement which provides that "This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts without giving effect to its conflict of laws principles."   DN 27-1, p. 5, ¶ 13, PageID #165.

The court deems the choice of law question abandoned.   "Choice of law does not limit the court's subject matter jurisdiction, therefore it is normally waivable."   *Viscofan USA, Inc. v. Flint Group*, No. 08-CV-2066, 2009 WL 1285529 (C.D.Ill. May 7, 2009), *citing Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995); *Schneider v. Canal Ins. Co.,* No. 98-CV-5368(JG), 1999 WL 689476, *8 (E.D.N.Y. Sept. 1, 1999)(stating that conduct indicating the parties' consent to apply a body of law can consist of cases cited and relied upon the parties in their briefs, and their apparent decision not to raise the choice-of-law issue).   *Accord, LeSaint Logisitics, LLC v. Electra Bicycle Company, LLC*, 146 F.Supp.3d 972, 976 (N.D.Ill. 2015)(applied Illinois law rather than California law designated by choice of law provision but found to have been waived, as "the parties rely extensively, if not exclusively, on Illinois law."). *See also In re Trade Partners, Inc. v. Investors Litigation*, MDL Docket No. 1846, 2008 WL 2757835 (W.D.Mich. July 8, 2008)("*In Meridia Products Liability Litigation*, the Sixth Circuit held that plaintiffs who had directed the district court to *In re TMJ II*, instead of engaging in choice–of-law analysis, had waived the choice-of-law issue [concerning various choice-of-law clauses]."); *Meridia Products Liability Litigation v. Abbott Laboratories*, 447 F.3d 861 (6th Cir. 2006)(Court of Appeals found choice-of-law issue waived where the parties did not raise the argument and the court relied upon law brought to the court's attention by the parties); *Womack v. Wal-Mart Stores, Inc.*, No. 16-1547, 2017 WL 715898 (6th Cir. Feb. 23, 2017)(Review of

conflicts issue denied where plaintiff did not raise argument below and, in fact, cited only Michigan cases on summary judgment).

In any event, the court is untroubled by the parties' application of Kentucky law in this instance, as  (1) Vogt, a Delaware Corporation, has its principle place of business in Louisville, Kentucky (First Amended Complaint ("FAC"), ¶ 3, DN 84, PageID #1239);  (2) Kapsalis is said to reside here and did so during his tenure with Vogt (FAC, ¶¶ 6, PageID #1239, Kapsalis 10/14 Depo., Vol. I, pp. 75-76); and (3) Many of the alleged wrongful acts are said to have occurred at Vogt toward the end of his employment there (FAC, ¶¶ 25, 27, 30, 31, 32, 35, PageID #s 1243-1245).  Additionally, we glean from the face of the cover letter that the contract of employment with Babcock/Vogt was either emailed or mailed to Kapsalis.  The address listed on the cover letter is identified in the FAC as his home address in Prospect, Kentucky. FAC, ¶ 6, PageID #1239. Kapsalis executed the agreement and returned it to Michael LeClair at BPI as a condition of employment. FAC, ¶¶ 12, 17, PageID #s 1240-1241; DN 254, Ex. B, PageID #s 28479-28486. Thus, it appears that the contract was executed and allegedly breached, in part, in Kentucky.

The court will apply Kentucky law in evaluating the substantive issues raised in Kapsalis' motions.

## I.   Background[3]

Kapsalis was hired by BPI as Chief Operating Officer in 2009.   Shortly thereafter, Kapsalis was transferred to the position of Chief Executive Officer ("CEO") of Vogt, a wholly owned subsidiary of Babcock.  This matter arose from Kapsalis' resignation on April 11, 2013 from his position of CEO of Vogt, and acceptance of a position as President and CEO of

---

[3] This background section is intended to provide context for the reader and should not be interpreted as findings of fact.

Express, a competitor of BPI and Vogt. The degree to which Express competed with BPI and Vogt is disputed.  The parties do agree, however, that Vogt has had significant success in the industry in certain areas which were not the primary focus of Express during the time Kapsalis worked for Vogt. An issue of paramount importance to Vogt in this case is its ability to preserve its share of the utility size Heat Recovery Steam Generator ("HRSG") market.

BPI is self-described as

> [A] global, multi-product, energy and environmental services and systems enterprise, with active projects in more than ten countries.  Through its   various subsidiaries, BPI supplies technology, equipment, and aftermarket services for heat exchangers, heat recovery steam generators ("HRSGs"), steam generators, and environmental products for the power-generation, industrial, biomass, solar, and waste-to-energy markets.

FAC, ¶ 2, PageID #1239.

> Vogt is self-described as follows:

> Vogt Power specializes in the design, manufacturing, and supply of HRSGs, selective catalytic reduction systems, simple cycle exhaust systems, once-through steam generators, fired heaters, waste heat recovery units and aftermarket related services.  Vogt Power is recognized throughout the world as an industry leader with a foundation of engineering excellence and expertise in HRSGs and its other products and services.

FAC, ¶ 4, PageID # 1239.

> At the time of Kapsalis' initial hire in 2009, he executed an Employee Non-Disclosure, Non-Solicitation, Non-Competition and Assignment Agreement (the "Agreement") which required, in pertinent part, that

> (1) During the term of my employment with the Company and for a period of five (5) years thereafter, I will not divulge to anyone or use for my own benefit or the benefit of any third party any confidential information of the Company, its customers or suppliers, or any information received in confidence from third parties by the Company (including, without limitation, all technical designs and

specifications, trade secrets, manufacturing techniques, financial data and marketing strategies)(collectively, the "Confidential Information") learned by me as a result of any task assigned to me or work performed by me for or on behalf of the Company… <u>and</u>

(3)(b) During the period of my employment with the Company and for one (1) year thereafter, regardless of the reasons for my termination of employment with the Company, I will not, other than in the course of performing my duties on behalf of the Company, directly or indirectly through another person or entity…(iii) divert or attempt to divert away from the Company any business opportunity for a job, contract or other business relationship that was ongoing or actively pursued by the Company during the one year prior to the termination of his employment.

DN 27-1, PageID #s161, 163.

During his employment with BPI and later Vogt, Kapsalis was given access to competition-sensitive and proprietary information of both Vogt and BPI, including strategic planning, marketing, sales, estimating, pricing, market analysis and other strategic and confidential information accessible only by high-level individuals in the companies.  FAC, ¶ 21, PageID #1242.

In December of 2012, Kapsalis began communicating with Express about possible employment, and was offered the position of President and CEO of Express in February or March 2013.  FAC, ¶¶ 22, 23, PageID #s 1242-1243.  On March 29, 2013, Kapsalis announced his resignation.  His last day of work at Vogt was April 11, 2013. FAC, ¶ 28, PageID #1243.

Vogt alleges that Kapsalis  breached his fiduciary duties to the company and violated the Agreement prior to and during the first year after leaving Vogt by aggressively beginning to feather his new nest, taking proprietary and confidential documents and making contact with Vogt customers concerning his move to Express and business opportunities ahead. Vogt also alleges that Kapsalis' actions violated the Computer Fraud and Abuse Act, the Lanham Act, and the Kentucky Uniform Trade Secrets Act, and constituted common law conversion.

Vogt sought and obtained a temporary restraining order ("TRO") and a preliminary injunction early on in this case   DN 35, PageID #486.   Judge Heyburn held an evidentiary hearing on the motion for preliminary injunction and issued an opinion in which he quoted the Kentucky Uniform Trade Secrets Act ("KUTSA") which protects as a "trade secret"

> Information…that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

KRS § 365.880(4).  DN 34, p. 2, PageID #481.

Judge Heyburn determined that one of the items claimed to be a protectable trade secret, the so-called "Contact List," "appear[ed] to fit this definition" as it was confidential and protectable information concerning Vogt's customers "compiled…over a period of multiple decades at significant corporate cost, including multiple trips overseas.   This Contact List represents Vogt/BPI's essential business play book.  The inherent value is in its compilation." DN 34, p.2, PageID #481.   He found that the information was not "readily ascertainable," and held that

> It is immaterial that Kapsalis may be able to recreate a list of business-card type information…or that such list might end up having striking similarities to the information contained in the list contested here.  That Kapsalis may have much of the same knowledge, may know many of the same persons, and knows many of the telephone numbers by memory does not make the Vogt Contact List any less protectable.

*Id.*, pp. 2-3, PageID #481-82.  Judge Heyburn further concluded that the Contact List was protectable under the terms of the confidentiality clause recited above, as well.  *Id.*, p. 3, PageID #482.  Upon making these findings, he entered a preliminary injunction ordering, in pertinent part:

(1) Defendant is restrained from using, disclosing, misusing, or further converting Babcock and Vogt Power's confidential, proprietary, or trade secret information, including but not limited to, customer contracts, customer contacts complied into Vogt's database after August 7, 2009, strategic plans, marketing information, pricing information, passwords, and other confidential customer information;

(2) Defendant is restrained from soliciting or otherwise initiating further contact or communications with any Babcock or Vogt Power customers for the purpose of inviting, encouraging, or requesting the transfer of accounts or business patronage from Babcock or Vogt Power.

DN 35, pp. 1-2, PageID #486-87.  Paragraph (2) expired April 11, 2014, on the one-year anniversary of Kapsalis' termination of employment with Vogt. *Id.* p. 2, fn. 1, PageID #487.

There has been extensive litigation over the motion of Vogt in which it seeks an order of contempt for alleged violations of the TRO and preliminary injunction by Kapsalis (DN 143). We will address that motion in due course.  First, we will address Kapsalis' summary judgment motions.  The parties agreed that these two motions should be decided on the present record.

## II.  Lack of Specificity in Identifying Trade Secrets (DN 281) and Failure to Establish Elements of Misappropriation of Trade Secrets Claim  (DN 119-1, Section II.B.)

The memorandum filed on the issue of lack of specificity is described by Kapsalis as a "Supplemental Memorandum in support of their Motion for Summary Judgment."  DN 281-1, PageID # 29839.  The motion accompanying this supplemental memorandum, DN 281, PageID #29836, is identical to its earlier motion for summary judgment, DN 119, PageID #2119, and seeks summary judgment on all counts on a variety of theories. In this first section, the court will address the challenge to the specificity of the trade secret disclosures (DN 281) and the section of the other pending summary judgment motion (DN 119) which urges that Vogt has failed to

adduce evidence of the other elements of a misappropriation of trade secrets claim under KUTSA. (Section II.B.)[4]

Kapsalis urges that he is entitled to summary judgment on the ground that Vogt has failed to identify its purported trade secrets with enough specificity to put him on notice of the nature of Vogt's trade secrets claim.  DN 281-1, p. 10, PageID #29848.  He also contends that Vogt has failed to adduce evidence of materials which would constitute protectable trade secrets, or that Kapsalis misappropriated them.  DN 119-1, p. 23-24, PageID #2144-2145.

The disclosure of Vogt's purported trade secrets is found at DN 374, PageID #33773, and DN 376 PageID #33874 (sealed).  This final disclosure comes after resolution of numerous discovery disputes ongoing since February of 2014.  In March of 2016, Kapsalis moved for the sanction of dismissal of the trade secret misappropriation claim under Rule 37 for Vogt's purported continuing failure to identify its trade secrets with specificity in accordance with the magistrate judge's prior orders.  DN 223, PageID #26183.  The motion for sanctions was denied by United States Magistrate Judge Colin H. Lindsay who concluded that Vogt's April 2016 disclosure complied with his orders because "plaintiffs have included both a narrative description of the trade secrets along with specific Bates-numbers of the documents that they claim constitute trade secrets."  DN 361, PageID #33742-33743.  The magistrate judge went on to require a bit more fine tuning by the plaintiff in the form of specific identification of the trade secret portion of a document for any document listed which is alleged to contain both trade secret and non-trade secret information.  DN 361, PageID #33743.  Vogt did just that in DNs 374 and 376, providing a final list of Bates numbered documents, a comparison view document which identifies all additional changes made to the prior list, and a separate sealed compedium of those

---

[4] In addressing DN 119 later in this opinion, the court will take up the question concerning evidence of damages with respect to all of the claims, including the KUTSA claim.

documents which contain both trade secret and non-trade secret information, with the trade secret material highlighted.

Kapsalis complains that Vogt "string cites" in its list document, and identifies the documents in issue by general categories such as "calculations" or "drawings," thus failing to provide the specificity required to adequately identify trade secrets. He fails to mention the descriptive portion of the disclosure in which Vogt provides particular information about the documents in each category.  Cases in this circuit support a finding that Vogt's disclosure is sufficiently specific to satisfy KUTSA. [5]

KRS 365.880(4) defines "trade secret" to mean "information, including a formula, pattern, compilation, program, data, device, method, technique, or process that…[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and…[i]s the subject of efforts that are reasonable under the circumstances to maintain secrecy."  Additionally, "[t]o qualify as a trade secret, the information must 'derive independent economic value,' not be 'readily ascertainable by proper means,' and be the 'subject of efforts that are reasonable under the circumstances to maintain secrecy.'" *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp.2d 784, 794 (W.D.Ky. 2001)(*quoting* KRS 365.880); *Caudill Seed and Warehouse Company, Inc. v. Jarrow Formulas, Inc.*, 161 F.Supp.3d 513, 525 (W.D.Ky. 2015)(*quoting Auto Channel, Inc.*).

In *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410-11 (6th Cir. 2006), the Sixth Circuit found sufficient specificity in Mike's Train House's evidence of trade secrets to

---

[5] A number of Kapsalis' citations concerning specificity have been vacated, overturned, or amended and superseded by subsequent decision.  Vacated: *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F.Supp.3d 1305 (N.D.Ga. 2014); Overturned: *Integral Development Corporation v. Tolat*, 2014 WL 721844 (N.D.Cal. Feb. 24, 2014); Amended and Superseded: *Tucson Embedded Systems, Inc. v. Turbine Powered Tech. LLC*, 2016 WL 1268524 (D.Ariz. Mar. 31, 2016).

enable a jury to reasonably conclude that it had satisfied the first element of a misappropriation of trade secrets claim – that the information at issue actually constituted a "trade secret." *Id.* at 410. In considering the specificity with which an item need be shown to contain trade secrets, the court stated that items may properly be considered trade secrets even though they contain a mixture of information. Mike's Train House argued that drawings allegedly copied by the defendant contained several kinds of secret information such as tolerances, data and reference points, clearances, pivot points, spring tensions, and specific alloys that could not be determined by looking at pictures or taking measurements from a finished product. The court noted that "It is well settled that detailed manufacturing drawings and tolerance data are prima facie trade secrets. [citations omitted]." *Mike's Train House*, 472 F.3d at 410.[6] The court then noted that "a plaintiff may prevail in a trade-secrets case without identifying a specific item of information that is not publicly known or readily accessible…A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design, or operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.* at 410-11.

A very recent case from the Kentucky Court of Appeals, *Alph C. Kaufman, Inc. v. Cornerstone Industries Corporation*, No. 2014-CA-001790-MR, 2017 WL 943972 (Ky,App. March 10, 2017), addressed the sufficiency of certain types of evidence similar to evidence disclosed in this case. On appeal taken after a lengthy jury trial, appellants urged that bid sheet templates, information regarding certain bids, bid preparation tools and pricing information of the company did not constitute "trade secrets." The court of appeals found that sufficient evidence supported the jury's finding that these items constituted trade secrets:

---

[6] There is no Kentucky authority specifically adopting a *prima facie* standard for such evidence. We do not rely on a presumption in our analysis.

Hess testified the information at issue was valuable to Cornerstone and contained commercially-sensitive information not available to the public at large.  In fact, Hess testified that only certain Cornerstone employees—primarily sales persons—had access to its bid documents.  Cornerstone's bid form was developed by Cornerstone to help its sales associates determine the right compliment of products to be used on a particular job.  Roby admitted it would be detrimental to Cornerstone if its bid documents fell into a competitor's hands.   Hess also testified Roby took digitized bid preparation documents, namely an active live Excel spreadsheet program document (not simply a paper form spreadsheet) used to calculate bid quotes.  The Excel spreadsheet, developed by Cornerstone, contained formulas embedded in the program.  It also contained Cornerstone's specific material costs and pricing information.  Hess testified this information was valuable and confidential because it would allow a competitor to underbid Cornerstone and to negotiate favorable deals with Cornerstone's suppliers that would in turn allow the competition to match or narrowly beat Cornerstone's bids. *Chruch v. Mut. Ins. Co. v. Smith*, 3:14-CV-749-JHM, 2015 WL 3480656, at *4 (W.D.Ky. June 2, 2015)("Trade secrets are valuable because they are secret—the secret information gives the user a competitive edge in a market for the very reason that the information is unknown to competitors.").

*Alph C. Kaufman*, 2017 WL 943972 at *11.  The court also noted that Cornerstone attempted to maintain the information's secrecy by having personnel sign non-competition agreements and implementing password-protected computer access.   *Id.*  at 12.   Further, in finding misappropriation, the court noted that:

A defendant "misappropriate[s] a trade secret if [the defendant] used it without proper consent, if the trade secret was disclosed improperly, or if it was acquired through improper means."  *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 672 (E.D.Ky. 2009)(citation omitted).  Cornerstone introduced evidence that Roby, while a Cornerstone employee and without authorization, accessed Cornerstone's password-protected servers and emailed confidential bid documents, bid preparation tools, and pricing information to his personal email account. Cornerstone also identified evidence indicating Roby used Cornerstone's proprietary information without Cornerstone's permission, to construct bids on behalf of Kaufman and ACK to Cornerstone's detriment.  We are fully cognizant that Appellants submitted evidence at trial that seemingly countered Cornerstone's evidence.   But ultimately we find that Cornerstone presented substantial, competent evidence from which it was reasonable for the jury to conclude that the information at issue constituted trade secrets and that Roby, assisted by Kaufman and ACK, misappropriated those secrets.

*Id.*

12

The court further notes that in *Integral Development Corporation v. Tolat*, No. 14-16629, 2017 WL 123316 (9th Cir. Jan. 11, 2017), the Ninth Circuit Court of Appeals reversed a decision relied upon herein by Kapsalis.  The case involved an offer of trade secrets evidence in a format similar to Vogt's categorization and explanation of its items.[7]  The court held that the CUTSA[8] claim based upon misappropriation of Integral's source code should have survived summary judgment.  *Id.* at *1.  In evaluating the district court's grant of summary judgment, the court of appeals stated

> Integral has identified three sets of information that it claims are trade secrets that Tolat misappropriated:  (1) facts about Integral's business that Tolat included in a resume he sent to EBS, one of Integral's competitors; (2) Integral's source code for its products; and (3) business documents containing, *inter alia*, customer lists and details about ongoing projects…There is evidence in the record that Tolat copied at least a portion of Integral's source code on to an external hard drive, in violation of Integral's policies, on November 5, 2012, shortly before he planned to retire from Integral…Integral has also identified specific key aspects of its source code that it claims Tolat misappropriated.  Thus, Integral sufficiently identified the information it alleges is a trade secret.

With these legal guideposts in place, we turn to the disclosure of Vogt's alleged trade secrets and the sufficiency of evidence concerning them.

Vogt has isolated documents it alleges constitute misappropriated trade secrets of Vogt.[9] The documents are identified by Bates number.  Vogt has divided these documents into the following categories: CAD standards, calculation sheets, customer lists, marketing information, schematics and mechanical drawings, strategic plans, engineering standard, and TRS program. These documents were all apparently found in Kapsalis' possession after he left Vogt. *See infra.* Tr. of TRO Hrg., DN 33, PageID #230.

---

[7] As the California Act's provisions differ from KUTSA in some respects, we do not cite *Integral Development* for analysis of the sufficiency of proof of the elements of a KUTSA claim.  We cite the case in regard to the question of specificity, for illustrative purposes only.

[8] California Uniform Trade Secrets Act.

[9] It is of no moment that the pages number in the thousands, as the documents are individually identified and the nature of the document and its trade secret value are accounted for under one of the categories discussed.

Despite identification by Bates number and category, highlighting of the claimed trade secret portions of combined documents, and a descriptive paragraph addressing each category with citations to the record, Kapsalis claims that Vogt's production is all an "undifferentiated mass of data" (DN 350, p. 4, PageID #33555) which does provide sufficient specificity for him to respond the contention that the materials are trade secrets.  (DN 281-1, p. 10, PageID #29848). The court rejects this contention and concludes that, taking the evidence in the light most favorable to the non-moving party, Vogt has come forward with sufficient evidence to overcome summary judgment on the ground of lack of specificity as well as the challenge to the sufficiency of evidence to support the contention that these materials are protectable trade secrets under KUTSA and that they were misappropriated by Kapsalis.

The plaintiff is not required to prove its misappropriation claim on summary judgment. It is sufficient for our purposes that Vogt has produced Bates stamped documents that Kapsalis does not dispute were in his possession after he left Vogt.  Vogt has come forward with evidence that Kapsalis did not have permission to take these materials.  Kapsalis urges that, for a number of reasons, he did not misappropriate the documents.  Vogt has established a triable issue on the question of misappropriation.   Vogt's categorization of the documents and evidence offered concerning their purported value to Vogt, although disputed by Kapsalis, is sufficiently specific to overcome summary judgment.

A.  CAD Standards

With regard to the "CAD standards" documents, Andrew Allen, BPI's Executive Vice President of Sales and Marketing, stated that "These CAD standards are standards that Vogt Power has created to control and maintain uniformity across Vogt Power mechanical drawings, and which constitute Vogt Power's engineering work product over a period of multiple

years…They represent Vogt Power's 'know how' and 'lessons learned.'" DN 145, p. 2, ¶ 9, PageID #3864). Kapsalis argues that much of the CAD standard material is non-trade secret material from CAD manuals or other public sources. However, a trade secret is not stripped of protection simply because it is accompanied by non-trade secret material. Additionally, in its final disclosure, Vogt has gone through the CAD standard documents and highlighted the trade secret portions, in accordance with Magistrate Judge Lindsay's order. Allen further stated that, in his educated opinion,[10] Vogt's CAD standards are unique "in the level of detail to which they produce customer-issued drawings and track specific cost codes and details within the detailing of an HRSG.[11] He stated that "If Express were looking to improve its processes or expand their product offering to HRSGs, these CAD standards could be implemented to create and/or improve their process." DN 145. P. 3, ¶ 10, PageID #3865.

Allen also addressed AutoCAD.dwg files which consist of "half-done" or "partial completion" files created by Vogt which he stated are utilized repeatedly for its HRSG contracts, cutting down significantly the required engineering man-hours. DN 145, p. 3, ¶12, PageID #3865. He also found among the documents "Vogt's Engineering Guide for Equipment Coding" which accompanies its CAD standards. DN 145, p. 4, ¶ 13, PageID #3866. These items appear to be valuable as part and parcel of the CAD standard group of documents.

We find that Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to find that its CAD standards constitute information not readily ascertainable by Vogt's competition, which was kept confidential,[12] and which derives

---

[10] He testified that he had prior experience with Vogt's competitors in the industry. Allen 01/13/16 depo., pp. 204-205, PageID #31621.

[11] Heat Recovery Steam Generator, arguably the most significant product in Vogt's repertoire, sold principally in a size utilized by utility companies.

[12] Kapsalis has not argued that any of the claimed trade secret documents fall outside of the confidentiality agreement he signed. We therefore presume for the sake of this analysis only, that all of these categories of materials were reasonably maintained as confidential by Vogt.

independent economic value to Vogt with respect to established high quality standards for its HRSG projects. Vogt further established sufficient evidence that such information in the hands of a competitor could afford a significant competitive advantage in the HRSG market.

## B.  Calculation Sheets

The category of "Calculation Sheets" consists of spreadsheets developed by Vogt for performing American Society of Mechanical Engineers (ASME) calculations which assure that HRSG components are designed to meet ASME safety standards.  DN 145, p. 3, ¶ 11, PageID #3865.   Allen explained that "[a]lthough calculations are determined by the ASME, the spreadsheet formulas and outputs contained in the Vogt Power spreadsheets allow the user to perform extensive calculations in an efficient way representing major cost savings."  He stated that these spreadsheets in native format contain embedded formulas and calculations developed by Vogt for performing these ASME calculations.  *Id.* He stated that the spreadsheets took innumerable man-hours to create and would thus have significant value in time and cost savings to any competitor.  *Id.*

We find that Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to find that Vogt's Calculation Sheets constitute information not readily ascertainable by Vogt's competition, which was kept confidential, and which derives independent economic value to Vogt with respect to ensuring that safety standards are met by its products.  Vogt has offered sufficient evidence for a reasonable jury to find significant cost and manpower savings to a competitor who obtained these items.

C.  Customer Lists

The "Customer Lists" of Vogt consist of names, contact phone numbers, and addresses for key individuals at each of its customers.   The issue of "Customer Lists" has formed the basis for much dispute in this case beginning early in the litigation with Judge John G. Heyburn's entry of a TRO and preliminary injunction.   Judge Heyburn addressed Vogt's claim that its "Contact List" was a protectable trade secret.  Dns 34, 35, PageID #s 480, 486.   Judge Heyburn found that Vogt had adduced evidence that the list was not simply business card-type information that could be ascertained from a telephone directory or other public source.  Rather, Vogt adduced evidence that the compilation of information was made by Vogt over multiple decades, done at considerable cost to the company, and constituted "Vogt/BPI's essential business play book." DN 34, p. 2, PageID #481.

The trade secret nature of this information has been hotly contested throughout the life of the case, including in the matter of Vogt's motion to hold Kapsalis in contempt of the TRO and preliminary injunction.  In a hearing on the contempt issue before the magistrate judge, BPI's President, Michael LeClair, testified concerning the nature and significance of the contacts which Kapsalis was privy to as a result of his employment with Vogt.  In reference to the particular contacts Vogt had at customer Black & Veatch, LeClair stated:

> Well, you wouldn't even get in the door if you didn't have the prior relationship established with these guys...

DN 279, p. 278, PageID #29800.

Vogt's James Wilder testified with respect to the contact information used by Vogt in its 12-week rolling schedule for conducting sales calls:

> …it was more than just the form of a schedule.  It was a list of all of our, as we
> defined them, key customers…a list of individuals that were important to
> maintain contact with…So, the most important thing would be, here is a list of our
> customers and the contacts who we have used as the key guys at each of those
> customers.

Walder 03/24/16 depo., DN 336-5, pp. 162-63, PageID #s 33417-18.  When asked "Were those

key guys, was that information that you could, say, go on a website and find?" Walder

responded:

> No, no.  Those are the people that we had learned of through years of contact, or
> if there had been an organizational change, and the previous position holder said
> I'm moving on or out, but here's my replacement, and you are going to want to
> make sure you meet him, so we would put that name in there.  And so we had
> worked hard in our business development process to get to know and maintain
> that list…[A]nybody that wasn't a decision-maker or a high level influencer,
> would never be on that list.

*Id.* at 163-64, PageID #s 33418-19.

Vogt has offered evidence that it developed and utilized in-depth knowledge concerning

its key customers, cultivating these contacts, and getting to know them on both a personal and

professional level.   As stated by Christopher Turner, Chief Commercial Officer and Vice

President of Sales and Marketing for Vogt, in his November 29, 2015 declaration,

> Kapsalis was fully aware of the importance of these customers [such as Siemens,
> Calpine, Black & Veatch, Fluor, and CB&I] during his employment with Vogt
> Power and understood the financial significance of business generated from them.
> I know this because we had many discussion during his employment about these
> issues…In particular, Kapsalis was aware, by virtue of his employment with Vogt
> Power and his introduction and exposure to these key customers resulting from
> that employment, of certain customer preference and activities that furthered Vogt
> Power's relationship with them.

DN 144, p. 8, ¶¶ 6, 7, PageID #3854.  Kapsalis pursued and cultivated these relationships with

these key contacts during his tenure with Vogt.  *Id.*

Judge Heyburn determined that the fact that "Kapsalis may have much of the same knowledge, may know many of the same persons, and knows many of the telephone numbers by memory does not make the Vogt Contact List any less protectable." DN 34, p. 3, PageID #482. We agree, and conclude that Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to find that its Customer Lists constitute information not readily ascertainable by Vogt's competition, which was kept confidential, and which derives independent economic value to Vogt with respect to its sales presence in the industry. Vogt has offered sufficient evidence to infer that this information would be valuable to a competitor who obtained such information about the inner workings of Vogt's customer relationships. Indeed, much of this case involves the activities of Kapsalis after leaving Vogt and joining Express where he continued to contact these key individuals, and for what benefit he would do so. For purposes of this motion, however, taking the evidence in the light most favorable to Vogt, Vogt has adduced sufficient evidence for a reasonable jury to find that Kapsalis identified value in Vogt's contacts for himself or for Express.

## D. Marketing Information

Vogt claims trade secret protection for a category of items termed "Marketing Information." In this category, Vogt includes two items in particular which Kapsalis has admitted taking from Vogt and using while at Express -- Vogt's 12-week rolling schedule (which we described briefly in the earlier section addressing Customer Lists) and Vogt's Target Project Marketing Plan.[13] Kapsalis stated that he took the 12-week rolling schedule with Vogt's

---

[13] In its Amended Identification of Trade Secrets (DN 374, p. 4-5, PageID #33776-33777), Vogt quotes a number of pertinent statements in this regard made by Kapsalis in his deposition. Copies of the deposition excerpts are not attached, nor has Vogt identified where in the record this deposition can be found. The court has been unable to locate it. The parties have rendered the record in this case unnecessarily unmanageable. However, despite our

contact list information still on it and gave it to the Vice President of Sales at Express to convert

into a 12-week rolling schedule for Express.  DN 374, p. 4, PageID #33776, quoting Kapsalis

Depo. 288:1-289:3.

> Walder testified that the 12-week rolling schedule
>
> really was more than just the form of the schedule.  It was a list of all of our, as
> we defined them, key customers.  And we – we identified – we categorized them
> as As, Bs, and Cs.  And – and under each customer, certainly under all the As, we
> had a list of the individuals at that company that were important to maintain
> contact with.  And we would then have a person who was the primary person
> assigned the contact, as well as a backup…And then we would have this 12-week
> rolling schedule, let's say, okay, here is the date we're anticipating meeting with
> these people, and here who from Vogt is planning on that meeting, and that would
> roll on a 12 weeks [sic].

DN 336-5, p. 162, PageID #33417.

> With respect to the Target Project Marketing Plan, Kapsalis testified that
>
> when you had a project you really wanted to focus on, you would take this
> template and you would fill out pertinent data about the project, and then you
> would outline let's say tour plan of attach for, you know, who would call on
> whom and that kind of thing to maximize your chances to win that.

DN 374, p. 5, PageID #33777, quoting Kapsalis Depo., 291:16-292:18.  Kapsalis admitted that

he took the Vogt Vogt's Target Project Marketing Plan and retooled it for Express:  "I used a

template, I crossed out all the – I took off all the Vogt-applicable information." *Id.*

The court concludes that Vogt has come forward with sufficient evidence, taken in the

light most favorable to Vogt, for a reasonable jury to find that Vogt's "Marketing Information"

in the form of its 12-Week Rolling Schedule and Target Project Marketing Plan constitute

information not readily ascertainable by Vogt's competition, which was kept confidential, and

which derives independent economic value to Vogt with respect to its business plans and

---

inability to locate the deposition, we have been given no reason to doubt the accuracy of the quotation as it appears
in the pleading, nor that this is, in fact, testimony of record in this case.

processes.   Vogt has offered sufficient evidence through Kapsalis' own testimony that a reasonable jury could find that a competitor who obtained these items could reformulate them and use them to its own business advantage.

### E.  Engineering Standards

With respect to the "Engineering Standard" category of documents, Vogt has stated that its "[e]ngineering standard documents are used by BPI and Vogt personnel in conjunction with a tagging system that is used to communicate with clients."  DN 374, p. 7, PageID #33779.  There is no citation to the record with respect to this group of documents.  There is no information provided concerning the documents' identity, purpose, or value beyond the single sentence quoted above.  Thus, there is no evidence offered upon which the court could base a finding that these documents are entitled to trade secret protection.  Summary judgment will be granted in favor of Kapsalis with respect to the "Engineering Standards" documents.

### F.  Schematic and Mechanical Drawings and TRS Program

Allen's testimony indicates that the Categories of "Schematics and Mechanical Drawings" and "TRS Program" comprise very valuable trade secret materials of Vogt.  DN 145, p. 4, ¶ 14, PageID #3866.  He notes that, in various project files, contract drawings of modules and physical design documents containing outputs of the TRS program for that contract provide insights into their design and manufacturing processes.  *Id.*   Allen testified that documents showing the methods of modular construction that Vogt uses would have "significant commercial and engineering value" because such information enables the duplication of Vogt's modularization process.  DN 302, pp. 186, PageID #31616.  He stated that "a competent engineer

21

that sees the methods associated in these drawings could retain that knowledge." *Id.* at 187,

PageID #31616. Turner explained that

> The documents Kapsalis removed from Vogt Power when he left would provide [a competitor] with a huge competitive advantage unavailable to newcomers to the HRSG market place. Including but not limited to information regarding modularization units built by Vogt Power. Modularization is a key difference between Vogt Power and its competitors…Vogt Power provides a very high level of modularization, while most of Vogt's competitors provide more of a broken down unit. Vogt Power's modules/boxes minimize the required hours to fabricate the units in the field, which saves our customers money and gives Vogt a competitive advantage. Vogt has two main module designs called "Smart" and "ECS"…Vogt Power's research and development costs for producing the Smart and ECS modules were incurred over a period of years and represent thousands of man-hours. The R & D costs for a competitor to build a similar modular design from scratch would be huge…Because Vogt Power can offer modularization...it…typically gets a credit on jobs for which it is bidding…[the mechanical drawings and sublevel drawings of the boxes and harps] could [be] easily cop[ied]…and completely undercut Vogt Power's competitive position in the marketplace.

DN 144, pp. 7-8, PageID #3859-3860. When asked what the difference is between Vogt's ECS

and SMART modularization and Vogt's competitors, he stated that it "[g]ives you more work in

the shop in a controlled environment with a higher quality that you would be able to deliver to

the site." DN 336-6, p. 4, PageID #33427.

Allen stated that Vogt's TRS program "calculates the thermal sizing of components in a

HRSG to the design conditions of a plant." DN 145, p. 4, PageID #3866. Allen contends that

"how Vogt Power builds its units and the minor details that go into Vogt Power units are a

reflection of multiple years of work and lessons learned. This is at the heart of what Vogt Power

does" and could be used to compete with Vogt in the marketplace, particularly in the HRSG

market and aftermarket service. DN 144, p. 5-6, PageID #3857-3858.

The court concludes that Vogt has come forward with sufficient evidence, taken in the

light most favorable to Vogt, for a reasonable jury to find that Vogt's "Schematics and

Mechanical Drawings" and "TRS Program" categories of documents constitute information not readily ascertainable by Vogt's competition, which was kept confidential, and which derives independent economic value to Vogt with respect to its design and manufacturing processes, particularly with respect to know-how developed over many years in modularizing HRSGs. Vogt has offered sufficient evidence that a reasonable jury could find that a competitor who obtained these items could gain a significant business advantage in developing its HRSG technology, copying Vogt's modularization processes, and gaining an advantage in aftermarket service.

## G.  Strategic Plans

Vogt claims that "Strategic Plans" including analyses of power industry/utility markets and strategic planning documents which compile the data and formulate a plan for growth and development in target markets.   According to Wilder, Vogt's strategic plan was "a living document that got edited, modified, and the schedule was modified accordingly."  DN 336-5, pp. 136-37, PageID #s 33409-33410.  Douglas J. Harding, Vice President for Strategic Operations for BPI, explained that within the strategic planning documents is data generated by his office:

> My office…takes the data [in the McCoy report which publicly lists all projects awarded by vendor, country, size, date, etc.] and organizes it (through excel formulas or pivot tables) based on certain criteria…This allows us to see where the historical activity has been for the specific focus product or region, in what magnitude and allows us to think through what is driving those orders (regional dynamics, commodity price, etc…).  The McCoy report does not provide any pricing information.

Harding Decl., DN 252, pp. 2-3, PageID #28418-28419.  Harding noted that various charts are created using internal and confidential methods and analysis.  *Id.*

Turner stated in his declaration that

> Kapsalis asked me [shortly before announcing his resignation], in the presence of Jim Walder and Manfred Pouzar, for a copy of Vogt Power's then-current strategic plan. He specifically asked for it on a flash drive. Kapsalis claimed that he needed to have it all in one place even though he had access to it on Vogt Power's server. Not knowing that Kapsalis had any intention of leaving Vogt Power, I made the copy requested and gave it to Kapsalis on a flash drive…In addition to the documents Kapsalis took from Vogt Power, I also reviewed several business presentations made by Kapsalis to Express regarding his plans for expanding its business. These documents make clear that Kapsalis had every intention of soliciting key customers of Vogt Power for their business,…expanding Express' business with regard to heat recovery steam generators or HRSGs—the primary focus of Vogt Power's business; and expanding into markets in which Vogt Power does business…

DN 144, pp. 3-4, 6-7, PageID #s 3855-3856, 3858-3859.

The court concludes that Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to find that Vogt's "Strategic Plans" documents constitute information not readily ascertainable by Vogt's competition, which was kept confidential, and which derives independent economic value to Vogt with respect to its market analyses and business strategies, particularly with respect to the HRSG market. Vogt has offered sufficient evidence that a reasonable jury could find that a competitor who obtained these items could gain a significant business advantage in seeking to develop its HRSG business, and would gain analytical data and Vogt's insight concerning the marketplace which it would not otherwise be able to obtain.

## H.  Misappropriation

Kapsalis urges that he is entitled to summary judgment on the ground that Vogt has not shown that he misappropriated any of its purported trade secrets. We find this contention to be without merit. Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to find that Kapsalis misappropriated the materials in issue.

Assuming the jury concluded that any one or more items detailed above constitutes trade secrets of the company, Vogt has come forward with sufficient evidence that these items were in the possession of Kapsalis after he resigned his position with Vogt.  Vogt has offered evidence that documents were found on Kapsalis' laptop and on an external drive, and that its contact list was found on Kapsalis' Express-issued cell phone. At the very least, Kapsalis himself admits to having taken the contact list, 12-week rolling schedule, and  strategic planning documents. While Kapsalis does not deny "taking" Vogt materials, he disputes that this was misappropriation.  Kapsalis' arguments are in the nature of defenses to Vogt's misappropriation claim. We have, then, a genuine issue of material fact concerning whether Kapsalis misappropriated Vogt's trade secrets.

In sum, the court concludes that Kapsalis is entitled to summary judgment on the ground of lack of specificity with respect to the "Engineering Standard" category of documents, but summary judgment on that ground as to all other categories of documents listed in DNs 374 and 376 and on the ground of failure to adduce sufficient evidence as to the other elements of a misappropriation of trade secrets claim under KUTSA will be denied.


III. Lack of Proof of Damages with Respect to All Claims (DN 119-1, Section I) and
     Failure to Establish Elements of Breach of Contract, Breach of Fiduciary Duty,
     Conversion of Intellectual Property, and Violation of the Lanham Act (DN 119-1,
     Sections II.A., II.C., II.D, and II.E.)[14]

A.  Misappropriation of Trade Secrets

Kapsalis contends that Vogt has not suffered any actual damages from the alleged misappropriation of trade secrets. He urges that even if there is no showing of actual loss, there

---

[14] The court does not address the claims against Express, Counts VII (Misappropriation of Trade Secrets), VIII (Conversion of Intellectual Property), and Court XI (Unjust Enrichment)(it appears the "XI" is a typographical error. There is no "Count IX" in the First Amended Complaint).

still must be evidence of an actual commercial use in order for a jury to alternatively award damages to Vogt in the form of a reasonable royalty.  Kapsalis argues that evidence of "actual commercial use" is lacking, as well as evidence of actual damages, and it is therefore entitled to summary judgment as to Count III for misappropriation of trade secrets.  The court disagrees.

KRS 365.884 states

(1) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant shall be entitled to recover damages for misappropriation.  Damages may include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.
(2) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (1).

Thus, Vogt need not show actual damages to recover under KUTSA for misappropriation of trade secrets.  Acknowledging this, Kapsalis then urges that there has been no showing of an "actual commercial use."

The Sixth Circuit explained in *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed. Appx. 479, 486 (6th Cir. 2002),

Where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant.  *See e.g., University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974).  If the benefit to the defendant in terms of direct profits is not ascertainable, damages may be awarded based on the value to the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs.  [citations omitted].

In response to Four Pillars' argument that a reasonable royalty could not be used as a damages method because no evidence of "commercial use" was established, the court stated

> The concept of commercial use is not limited to the fielding of directly competing products. *See, e.g., University Computing*, 504 F.2d at 536-37 (damages based on benefit to the defendant proper, on a "reasonable royalty" theory, when the defendant never successfully brought the product to market). Rather, courts seeking to establish a reasonable royalty measure the value of the secret to the defendant at the time it was misappropriated, regardless of the commercial success of the enterprise. *Ibid.* Here, FP did not directly copy Avery's products; rather, it modified Avery formulas, and used Avery's manufacturing specifications to cut their own research time and streamline its manufacturing processes…Avery presented relevant and admissible evidence showing that FP valued, deciphered, modified, and used Avery trade secrets; it was not required to do more.

*Id.* at 487; *See also, Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005).

Vogt has come forward with sufficient evidence, taken in the light most favorable to Vogt, for a reasonable jury to conclude that Kapsalis misappropriated its trade secrets and utilized them in an attempt to further the business of Express, benefitting from knowledge of Vogt's confidential market analyses, profit margin data, contacts, and modularization specifications, in particular. Vogt also offers evidence that knowledge gleaned from its trade secrets would allow Express to compete with Vogt in the portion of the HRSG market which was within Vogt's area of expertise, and that when he went to Express, Kapsalis intended for Express to to build its ability to compete in this area.

To show Kapsalis' commercial use of Vogt's trade secrets, Vogt offers evidence of a number of acts that Kapsalis himself admits: Kapsalis took and used the 12-week rolling schedule at Express (Kapsalis Depo., 290:20-291:22), Kapsalis used Vogt's Target Project Marketing Plan to develop a similar plan for Express (Kapsalis Depo., 294:10-295:13), and Kapsalis copied numerous pages from BPI and Vogt's strategic plans into strategic plans formulated for Express and presented to the Express Board of

27

Directors (Kapsalis Depo., 436:19-351:51).   While Kapsalis disagrees with the characterization and significance of this evidence, it is sufficient  for Vogt to overcome summary judgment on the ground of failure to adduce evidence of damages. Vogt has offered the testimony of its damages for misappropriation of trade secrets through expert James A. Gravitt, who has valued Vogt's loss at $9,114,327.00, accounting for each category of materials claimed by Vogt to constitute trade secrets.  DN 254-45, Ex. VV, p. 1, PageID #28722 (sealed). Although Kapsalis' expert disputes Gravitt's report, Kapsalis' objections go to the weight of the Gravitt evidence rather than its admissibility.  *KCH Services, Inc. v. Vanaire, Inc.*, No. 05-777-C, 2010 WL 1416672, *2 (W.D.Ky. Mar. 31, 2010).

Summary judgment on the ground of failure of proof of damages will be denied as to Count III for misappropriation of trade secrets.

### B.  Computer Fraud and Abuse Act

Count I of the FAC alleges that Kapsalis violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by "intentionally access[ing] BPI's and Vogt Power's client information and strategic plans residing on BPI's and Vogt Power's computers without authorization and/or in excess of his authorized access, and transferred that information outside BPI and Vogt Power to his own possession, thereby misappropriating…information…caus[ing] losses to BPI and Vogt Power in excess of $5,000."  FAC, DN 80-2, p 11, ¶¶ 58-59, PageID #1248.  As noted in *Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F.Supp.2d 378, 381 (S.D.NY. 2005), compensable "losses" under the CFAA arise from damage to, or the

inoperability of the accessed computer system. In rejecting a claim for lost profits due to a "competitive edge" gained by defendants through their wrongful access, the court noted that

> In *Nexans [v. Wires S.A. v. Sark-USA, Inc.*, 319 F.Supp.2d 468 (S.D.NY. 2004)], Judge Cedarbaum thoroughly examined the legislative history of the CFAA and various courts' interpretation of "loss" and determined that revenue lost because a defendant used unlawfully gained information to unfairly compete was not a type of "loss" contemplated under the CFAA. *Nexans*, 319 F.Supp.2d at 478.

*Id.* Vogt does not address this persuasive authority.

Summary judgment will be entered in favor of Kapsalis as to Count I of the FAC for breach of the Computer Fraud and Abuse Act.


C.  Breach of Fiduciary Duty

Count IV of the FAC alleges breach of fiduciary duty by Kapsalis. It alleges:

> In his role as President and CEO of Vogt Power and as a Senior Vice President of BPI, Kapsalis held a position of trust and confidence at Vogt Power and BPI and owed certain fiduciary duties to Vogt Power and BPI including, but not limited to, a duty to exercise the utmost good faith, loyalty and honesty in the performance of his duties and to avoid taking any improper advantage over Vogt Power and BPI.

FAC, DN 80-2, p. 14, ¶78, PageID #1251.

There appears to be no question that to the extent this claim involves Vogt's trade secrets, it is preempted by KUTSA. *Auto Channel, Inc.*, 144 F.Supp.2d at 793. We therefore look to Vogt's argument that Kapsalis breached his fiduciary duty through other conduct which could support a viable claim.

Vogt argues that Kapsalis breached his fiduciary duty by attending a vendor forum in Houston, Texas, along with Turner, at Vogt's expense, obtaining a list provided to attendees of key procurement people working for CB&I, and then contacting those procurement people, as

well as a Vogt key contact, Jim Malone, two weeks after resigning from Vogt.  Kapsalis Depo.,
210:23-216:25; Turner Decl., DN 144, p. 3, ¶ 12, PageID #3855.  Vogt claims that since it paid
for Kapsalis to attend the forum, the list of procurement people was the property of Vogt and
Kapsalis had no right to take it with him and use it.  This "use" allegedly took place after
Kapsalis left his employment with Vogt, so Kapsalis had no fiduciary duty to Vogt at that time.
To the extent it was a trade secret of Vogt, and Kapsalis misappropriated it, the claim would be
preempted by KUTSA. To the extent that Kapsalis contacted Jim Malone and CB&I, utilizing
information from what is claimed to be a trade-secret-protected list, the claim would still be
preempted by KUTSA.

There is no contention, however, that the list received at the vendor forum was a trade
secret or otherwise confidential information provided to Kapsalis in his capacity as an agent of
Vogt.  It was apparently a list which was provided to attendees of the forum including the
representatives of Vogt.  Vogt presumably received the list it was entitled to receive when its
employees returned from the forum.  There is no contention to the contrary.  Vogt has not argued
that it was entitled to exclusive use of this personnel list nor that it constituted information that
could not be obtained elsewhere by competitors.  The court finds insufficient evidence with
respect to the procurement personnel list to support an independent claim for breach of fiduciary
duty.

Vogt also argues that while still employed at Vogt, Kapsalis procured information
through employees Maggie Farmer (Kapsalis requested that she copy contact information to his
personal device) and Jim Walder (Kapsalis requested that Walder provide him with research
information on the Canadian market) which Kapsalis intended to use in his future employment.

This information is alleged to constitute trade secret materials of Vogt, and is thus preempted by KUTSA.

Vogt also vaguely suggests that Kapsalis was running his own real estate business, Capstone Asset Management, on company time, in violation of his fiduciary duty to Vogt. Vogt states, however, that due to discovery disputes, it has been unable to depose Mrs. Kapsalis and thus is "unable to fully respond..." DN 251, p. 44, PageID # 28355.

The parties agreed that the present motions could and should be decided on the record presently before the court. Therefore, we find that there is insufficient evidence with respect to the allegation that Kapsalis was running Capstone Asset Management on company time to support an independent claim for breach of fiduciary duty.

Summary judgment will be granted in favor of Kapsalis on Count IV for breach of fiduciary duty.

### D.  Lanham Act

Count V alleges that Kapsalis violated the Lanham Act, 15 U.S.C. § 1125(a), alleging that "Kapsalis has made deals and misleading statements in interstate commerce and in connection with goods or services in commercial advertising or promotion including making statements that BPI and Vogt Power 'acquired' Capstone Engineering in 2009, in violation of the Lanham Act, 15 U.S.C. § 1125(a)…Upon information and bedlief Kapsalis' misrepresentations about BPI and Vogt Power's [sic] have resulted in misinformation in the marketplace about BPI and Vogt Power, which have caused BPI and Vogt Power damage." FAC, DN 80-1, p. 15, ¶¶ 82, 84 PageID #1252.

The claim, as alleged in the FAC, makes little sense. In *American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery*, 185 F.3d 606 (6th Cir. 1999), the Sixth Circuit set out the requirements to state a cause of action for misleading advertising under the Lanham Act:

> [A] plaintiff must establish the following: 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*American Council, etc.*, 185 F.Supp.3d at 613; *See also, Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014).

The extent of Vogt's argument in opposition to summary judgement is that Kapsalis "made false assertions to customers of BPI and Vogt Power" by sending an email to Trey Wills of Fluor making a false statement that his [Kapsalis'] Agreement with Vogt would not disqualify him [Kapsalis] from obtaining business from Fluor during the year following his resignation from Vogt.  Vogt then states that absent additional discovery, it is impossible for it to know whether it lost "any further business from their customers to Kapsalis and Express."  DN 251, p. 47, PageID #28358.

Again, by agreement of the parties, the summary judgment motions are to be decided on the current record.  To the extent that there is a comprehensible argument in the paragraph above, the claim fails to state a Lanham Act violation for the following reasons: (1) there was no statement of fact concerning a product, only a statement about Kapsalis' personal legal obligations; (2) the audience the false statement is supposed to deceive or intend to deceive is not clearly identified, but to the extent that it is suggested that the audience is Fluor, the statement

was made to one person only, Trey Wills.   There is no suggestion that the statement was communicated to anyone else; (3) the statement is not alleged to be material; materiality is not mentioned; (4) the interstate commerce nexus is not alleged; (5) Vogt has not shown any causal link between Kapsalis' statement to Wills about the extent of his personal legal obligations and any harm to Vogt.  Any such suggestion is pure conjecture.

Further, we note that the FAC alleges that Kapsalis "made deals and misleading statements" including that "Vogt Power 'acquired' Capstone Engineering in 2009."  DN 80-2, p. 15, ¶ 82, PageID #1252.  This allegation is not mentioned in Vogt's brief. "Deals and misleading statements" other than the single statement to Wills have not been developed in Vogt's opposition to summary judgment (DN 251), and are deemed abandoned.

Summary judgment will be granted in favor of Kapsalis on Count V alleging violation of the Lanham Act.

### E.  Conversion of Intellectual Property

Count VI of the FAC alleges conversion by Kapsalis of Vogt's intellectual property.  To the extent that the intellectual property in question constitutes trade secrets of Vogt, the claim is preempted by KUTSA.  *Spectrum Scan, LLC v. AGM California*, 519 F.Supp.2d 655, 657 (W.D.Ky. 2007), *citing Auto Channel, Inc. v. Speedvision Network*, 144 F.Supp.2d 784 (W.D.Ky. 2001).

To the extent that the intellectual property does not constitute trade secrets, the claim for conversion would not be preempted.  In addition to the basic elements of proof of ownership and the conversion by another of the property, Vogt must also establish that it suffered damages by reason of the conversion. *See, ie. Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky.App. 2014).   The court must therefore consider Kapsalis' challenge to Vogt's proof of

damages in order to determine whether this count of the FAC can survive summary judgment. The proof of damages issue is considered in the following section with respect to the "Confidentiality" clause of the contract claim.

### F.   Breach of Contract

Kapsalis has argued that Vogt (1) has not come forward with sufficient evidence that he breached the Agreement, and (2) has not come forward with sufficient evidence of damages attributable to any such breach to survive summary judgment.

### 1.   "Confidentiality" Clause

We find that Vogt has shown a genuine issue of material fact with respect to breach of the "Confidentiality" clause of the Agreement with respect to confidential documents. As discussed earlier in this opinion, at the very least, Kapsalis' own testimony has ensured a finding that a genuine issue of material fact exists concerning his actions in taking Vogt's contact list, 12-week rolling schedule, and  strategic planning documents.  Despite his insistence that his actions should not be found to be wrongful, Kapsalis has admitted taking the contact list.  He also admitted taking the 12-week rolling schedule and strategic planning documents, and modifying and utilizing them at Express.  We have already determined that, to the extent these and other items allegedly misappropriated by Kapsalis are "trade secrets," the claim for conversion of intellectual property is preempted.  Contract claims, however, are specifically exempted from preemption by KUTSA. "KUTSA does not preempt contract claims, even if those claims are based on the misappropriation of trade secrets.  *See* K.R.S. 365.892, *Auto Channel*, 144 F.Supp.2d at 788, *T.D.I. International*, 2008 WL 294531 at *4 (E.D.Ky. 2008)."

*FBK Partners, Inc. v. Thomas*, Civil No. 09-292-GFVT, 2010 WL 4940056 at *3 (E.D.Ky. Nov. 30, 2010).

We noted earlier in the opinion that the evidence of efforts to maintain the confidentiality of the documents alleged by Vogt to be trade secrets was sufficient to overcome summary judgment. Indeed, Vogt required Kapsalis to sign the Agreement detailing its expectations regarding confidentiality as a condition of employment. The "Confidentiality" clause of the Agreement states:

> During the term of my employment with the Company and for a period of five (5) years thereafter, I will not divulge to anyone or use for my own benefit or the benefit of any third party any confidential information of the Company, its customers or suppliers, or any information received in confidence from third parties by the Company (including, without limitation, all technical designs and specifications, trade secrets, manufacturing techniques, financial data and marketing strategies)(collectively the "Confidential Information")…

DN 27-1, p. 2, ¶ 1, PageID #161. Confidentiality must, of course, be proven by Vogt. We merely reiterate here with respect to the claim for breach of the "Confidentiality" clause of the Agreement that Vogt has come forward with sufficient evidence of its efforts to maintain confidentiality in order to overcome summary judgment.

Further, we find that Vogt has come forward with sufficient evidence for a reasonable jury to conclude that some Vogt materials were either "divulged" by Kapsalis to a third party or "used for" Kapsalis' "own benefit" or "the benefit of [a] third party."

We find that Vogt has come forward with sufficient evidence from which a reasonable jury could find damages attributable to Kapsalis for breach of the "Confidentiality" clause of the Agreement. As noted earlier, Vogt's expert, Gravitt, has opined as to the value of the alleged injury caused by the alleged wrongful taking of intangible assets. DN 254-45, PageID #28722 (sealed). Should these intangible assets be proven to be trade secrets under KUTSA or

confidential documents protected by the "Confidentiality" clause of the Agreement, Gravitt's expert opinion constitutes sufficient evidence of damages, and, for the reasons already stated herein, Vogt has come forward with sufficient evidence upon which a reasonable jury could conclude that Kapsalis misappropriated Vogt's trade secrets and/or breached the "Confidentiality" clause of the Agreement, causing such damages. Summary judgment will be denied as to Count II of the FAC with respect to the claim of breach of the "Confidentiality" clause of the Agreement. We find that the same damages analysis applies to the remaining portion of the conversion claim for which damages must also be established. Therefore, summary judgment will also be denied as to Count VI for conversion of intellectual property with respect to non-trade secret intellectual property.

### 2. "Non-Divert" Clause

Vogt also claims that it has offered sufficient evidence to establish that Kapsalis breached the "Non-Competition/Non-Solicitation" clause of the Agreement. We find this claim to be a bit less straightforward. The clause provided, in pertinent part, that

> During the period of my employment with the Company and for one (1) year thereafter…I will not…directly or indirectly through another person or entity…divert or attempt to divert away from the Company any business opportunity for a job, contract or other business relationship that was ongoing or actively pursued by the Company during the one year prior to the termination of my employment.

This case involves one of the more unusual "non-compete" clauses this court has seen. We refer to this clause as the "Non-Divert" clause of the Agreement.

In discussing the origin of the Agreement as a whole, Vogt adduced the following testimony:

As President and CEO of Vogt, Kapsalis was responsible for strategic planning, budgeting, leadership, and overall performance of the company.  Kapsalis Depo., pp. 57-58, 101-102.  In this position, he necessarily had access to the most sensitive and proprietary information concerning the internal workings of BPI and Vogt, and their business relationships.  As explained by Turner, who, as the Chief Commercial Officer, VP—Sales and Marketing for Vogt, worked closely with Kapsalis during Kapsalis' tenure as CEO,  Kapsalis was actively involved in the pursuit and cultivation of relationships with Vogt's most important customers.  Turner Decl., p. 1-2, DN 144, p. 1-2, PageID #3853-3854.  Among the key customers were Siemens, Calpine, Black & Veach, Fluor, and CB&I.  *Id.* By virtue of his employment with Vogt, Kapsalis had the opportunity to entertain select individuals from these companies, and solidify business relationships on behalf of Vogt.  *Id.*  at 2-3, PageID #3854-3855.  He had access to information concerning various key individuals' interests, by virtue of his position with Vogt and introduction to these key customers. *Id.*

Kapsalis' had intimate knowledge of and access to documents concerning the strategic plans and technical and business operations of Vogt which would, of course, make him an attractive candidate for competitors, both direct competitors, and those who might wish to expand into specific markets.  (*See, generally, concerning the nature of Vogt's business,* Turner Decl., pp. 3-8, PageID #3855-3860).  As a result of the highly sensitive and embedded nature of the CEO position, Vogt created the Agreement with its somewhat unconventional "Non-Divert" clause.

Vogt seeks to paint with the broadest brush in establishing that Kapsalis violated the "Non-Divert" clause of the Agreement.  *Any attempt* by Kapsalis to divert away *any business opportunity* or *business relationship* during the year prior to his departure from Vogt would be

fair game as proof of breach, Vogt urges, regardless of whether any contract or job was, in fact, diverted away from Vogt.  On the other hand, Kapsalis seeks to constrain the application of the clause to *jobs or contracts* ongoing or actively pursued by Vogt in the prior year.  He urges, essentially, that the "Non-Divert" clause designed to prevent the diversion of *actual business and business opportunities*, not the diversion of hopes and dreams, and that any damages suffered by Vogt (which must be proven in order for Vogt to succeed on its claims) must be traceable to a job or contract diverted away from Vogt by Kapsalis during the prohibition year.

Vogt argues that Kapsalis "deprived BPI and Vogt Power of the benefit of their bargain: *the full period of repose* [one year from the date of his departure from Vogt] *it paid for handsomely* to the tune of $1 million paid to Kapsalis in his salary…"  DN 251, p. 34, PageID #28345 (emphasis added).  It states: "[w]hat is clear…is that efforts were made that violated the Agreement and gave Express and Kapsalis *an unfair head start* that may well result in additional [as yet unidentified] ill-gotten gains."  *Id.* at p. 31, PageID #28342 (emphasis added). Vogt thus clearly sought to cover the relationship-building aspect of Kapsalis' job with this non-divert clause.

As a practical matter, loss of contracts by Vogt or the sudden writing of business by Express or another competitor can be easily be quantified, but such evidence cannot, alone, establish that such "damages" resulted from business opportunities diverted from Vogt.

Vogt must show damages attributable to Kapsalis' diversion away from the Company any business opportunity for a job, contract or other business relationship which was ongoing or actively pursued during the one year prior to the termination of his employment with Vogt. The "Non-Divert" clause has lots of moving parts.

First, there must be diversion away, which requires, necessarily, proof of something to divert. That is, in order to prove diversion away of a business opportunity, for example, Vogt must have had that business opportunity in first instance, or Vogt must be able to establish some legitimate concrete expectation of receiving that business in the future.  It is insufficient to state, in general terms, that we "did business" with Company X, and therefore, any business written by a competitor with Company X was a business opportunity diverted away from us.

The "Non-Divert" clause provides specific direction to Vogt in establishing the diversion away of a business opportunity.  The clause specifies that it must be a particular type of business opportunity which is diverted away.  It must be a business opportunity for a job, contract, or other business relationship.  Thus Vogt must identify the job, contract or other business relationship for which it had a business opportunity.  Vogt appears to be focused most heavily on the "other business relationship" option, urging that its prior business relationship with one or more of its key customers was diverted away by Kapsalis.

Additionally, the clause further directs that the job, contract or other business relationship must have be one that was ongoing or actively pursued by Vogt during the one year prior to Kapsalis' termination.  Again, the "we did business with Company X" approach will not do. Where a plaintiff seeks, in a free market system, to claim entitlement to business which was won by a competitor, specifics establishing that allegation of entitlement must be proven.  More than a scattershot approach to proof of damages is required.

Finally, the "Non-Divert" clause constrains conduct, both direct, and indirect.  However, indirect diversion of a business opportunity, as through the actions of another person, does not blur the lines of proof required to establish causation. Vogt would still be required to prove that Kapsalis diverted a business opportunity away from Vogt, albeit, indirectly. Again, generalities

simply cannot carry the day.  It is not enough to suggest a general "casting of a sphere of influence."  Any such influence must be shown to have caused a diversion of a business opportunity.  In fact, the further away from direct action the clause veers, the more difficult it becomes to trace the necessary causation to establish a diversion and resulting damages.

In a nutshell, this case involves companies and individuals operating in a dynamic business environment. Competitors are not precluded from competing.  Only Kapsalis' actions are constrained by the Agreement.  By virtue of the language of the "Non-Divert" clause, a much more nuanced analysis of the evidence offered to establish a purported breach and alleged damages is required than in the garden variety case where John Smith, widget salesman, is precluded from selling widgets within twenty miles of Louisville for one year. Vogt sought to cover much with this "Non-Divert" clause.  Whether it has succeeded in marshalling sufficient evidence to go forward on this clause is another matter.

In order to succeed on a claim for breach of the "Non-Divert" clause of the Agreement, Vogt must offer sufficient evidence from which a reasonable jury could conclude that Kapsalis' actions constituted a "diver[sion] away from the Company [of] any business opportunity for a job, contract or other business relationship that was ongoing or actively pursued by the Company during the one year prior to the termination of [Kapsalis'] employment."

Only a diversion will do, as an "attempt to divert" a business opportunity for job, contract, or other business relationship results in no damages, and damages are a necessary element of a claim for breach of contract. As stated in *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky.App. 2007),

> To be enforceable, a "contract must contain definite and certain terms setting forth promises of performance to be rendered by each party." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)…However, establishing the existence of a contract is not sufficient to sustain a cause of action for breach of contract.

> Barnett must also prove that Lourdes breached the contract and that he suffered damages as a result of that breach…That is where Barnett's claim for breach of contract fails.  Assuming for the sake of argument that Lourdes did breach the contract, Barnett has not put forth any evidence that he suffered any damages.

*See also L.M. Comstock & Company, Inc. v. Becon Construction Company, Inc.*, 932 F.Supp. 906, 944 (E.D.Ky. 1993)("Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach."). An unsuccessful "attempt to divert" yields nothing.  A successful "attempt to divert" is a diversion.  Therefore, despite language that appears to sweep broadly, such "attempt" language does not offer any ground for a compensable breach of contract claim under the "Non-Divert" clause.

So in order to succeed on a breach of contract claim for breach of the non-divert clause, Vogt must come forward with evidence that Kapsalis did more than just reach out to Vogt's key customers or introduce Express personnel to various significant contacts.[15]  It must establish that he diverted away a concrete business expectation from Vogt which caused Vogt to suffer actual damages.

Vogt spends many pages detailing evidence to establish Kapsalis' pursuit of Vogt's key contacts and his efforts to establish lines of communication to promote future business with Express.  DN 251, pp. 8-20, PageID #s 28319-28331.  Vogt states "[T]here is no question that Kapsalis ***repeatedly***  solicited BPI and Vogt Power's customers including Siemens, Calpine, Fluor, CB&I and Black & Veatch over an extended period of time including the period immediately following the entry of the TRO restraining him from doing so."  DN 251, p. 33, PageID #28344.

---

[15] To be clear, if Kapsalis used confidential information, trade secret or otherwise, in engaging in such activities, KUTSA or breach of the "Confidentiality" clause provision of the contract may be proven without the requirement of showing that he diverted a business opportunity thereby.

Kapsalis does not, in fact, deny that he contacted Vogt customers when he went to Express.  Vogt has shown that Kapsalis reached out to key customers, told them of his move, told them about the nature of Express' business, and met with many of them to, in his words, "understand the proper communication channels to ensure that we are seeing opportunities from you that fit our core competencies.  In addition, I [Kapsalis'] am in the process of preparing our [Express'] 2014-2018 strategic plan and would like to hear your thoughts on our served markets in general as well as any specific projects on your radar screen."  Kapsalis admits that he entertained these customers on behalf of Express, as he had at Vogt, but urges that he did not divert any business opportunities by this conduct.  Some of it, he professes, was just catching up with various individuals on a personal level.  Despite Vogt's urging that these activities breached the "Non-Divert" clause of the Agreement, Kapsalis staunchly maintains that the clause did not preclude him from making business contacts as long as there was no diversion away from Vogt of business pursued by Vogt in the prior year. Vogt responds that Kapsalis did so, as evidenced by the following "damages":

(1) $2,431,000 sale to Black & Veatch in March 2015;

(2) Multiple smaller sales to Calpine;

(3) Additional sales may also have been made and/or additional sales may be on their way from other Vogt customers;

(4) Unawarded Wolf Data Center bid; and

(5) Any work that Express may get from Siemens in the future.

DN 251, pp. 31, 33-35, PageID #s 28342, 28344-28345.  We will address these items seriatim.[16]

---

[16] We reiterate that Vogt agreed with Kapsalis that the summary judgment motions could be decided on the record. Despite Vogt's comments that there may be other contract damages evidence out there which has yet to be produced, the court finds that any argument with respect to damages evidence which has not been offered herein is waived for purposes of this summary judgment.

With respect to the $2,431,000 sale to Black & Veatch in March, 2015, we note that the Request for Quotation ("RFQ") for this sale was made in March of 2015 and the Purchase Order date was June 23, 2015, over a year after the expiration of the non-divert clause of the Agreement.  Jennifer Logan's Notes, Ex. 2 to Logan Depo., DN 254-43, p. 3, ¶ 3, PageID #28700 (sealed).  Further, Express had an existing relationship with Black & Veatch prior to Kapsalis' entry on the scene, having written many proposals for projects "as far back as 2005" including for Black Hills Corporation, for whom Black & Veatch was the engineer on the 2015 project. *Id*. at pp. 3-4, PageID #s 28700-28701. Brian Crockett made the sale. *Id.*

Vogt's evidence does not establish, nor even suggest, that this business opportunity was diverted from Vogt.  Vogt does not state that it submitted a bid, or that it did not receive an RFQ for this business because of Kapsalis' actions.  Vogt does not, in fact, allege anything at all with respect to involvement of Kapsalis in obtaining the contract or influencing Express' success with this piece of business.  This sale was a year after the expiration of the non-divert agreement and made by someone other than Kapsalis.  Additionally, this was not a sale of an HRSG which much of Vogt's evidence suggests Kapsalis was targeting, such as in his apparent pursuit of the Wolf Data Center project.  As this occurred well after the expiration of the expiration of the "Non-Divert" clause, Vogt must show some connection between Kapsalis' activities during the non-divert period and this sale in order to successfully argue that Kapsalis' actions caused the diversion of this piece of business away from Vogt.

Vogt argues that during the prohibition period Kapsalis made repeated efforts to obtain business for Express from Black & Veatch by courting key contacts.  It also argues that damages to Vogt need not have been realized within one year of Kapsalis' termination of employment with Vogt.  These contentions do not bridge the evidentiary gap with respect to this piece of

business, however.  The mere writing of a piece of business by Express does not *ipso facto* constitute a business opportunity diverted from Vogt, especially where Vogt has provided no indication that it sought or had any genuine expectation of receiving the business, the RFQ and Purchase Order were received well beyond the non-divert period, and there is no connection between Kapsalis and this sale beyond the general allegations that Kapsalis disregarded the "Non-Divert" clause while it was in force and pursued Black & Veatch's business.  Thos court would not permit a jury to conclude on this meagre evidence that the 2015 sale to Black & Veatch was a diverted business opportunity for a contract which damaged Vogt.

Vogt next identifies "multiple smaller sales to Calpine" as contract damages purportedly suffered by Vogt in some unknown amount for some unspecified transactions.  This vague allegation is wholly insufficient.  In fact, this is simply not "evidence" of damages at all. Vogt's theory is that Kapsalis wooed Larry Vodrak, the Director of Construction Services at Calpine, and the key individual there with responsibility for purchasing HRSGs, and that Kapsalis identified Calpine as a strategic target for future business under the strategic plan he presented to the Express Board of Directors. Therefore, Vogt suggests that any business written by Express with Calpine must have been business diverted away from Vogt because Express did not have a prior relationship with Calpine.  But there is no evidence that supports Vogt's "logic." Vogt cannot account for sales that have not even been identified by Vogt.  Again, this is not evidence of damages suffered by Vogt.  Vogt cites to a deposition except of Jennifer Logan for its identification of "multiple smaller sales to Calpine." (DN 254-20, p. 134, PageID #28621).  This testimony indicates, however, that these "multiple smaller sales" consisted of two aftermarket sales, each for less than $1500.  Technically, two would be "multiple," and they were, apparently, "sales."  These sales were considered *de minimus,* however, and were not even

reported in Jennifer Logan's notes in which she itemized and detailed for Vogt sales  made by Express to Fluor, Calpine, Siemens, CB&I, and Black & Veatch (referred to as "disputed customers") from April 1, 2013 to February of 2016.  DN 254-43, p. 2, PageID #28699.   In any event, there is simply insufficient information offered by Vogt concerning these two sales.  Vogt cannot establish that this was a business opportunity for a job or contract ongoing or actively pursued by it in the prior year that was diverted away from Vogt, as Vogt does not even identify what the business was, when it was written, or by whom.

While Vogt suggests that Kapsalis was responsible for the diversion away of its business relationship with Calpine, it states nothing more than "Kapsalis' actions have not been without repercussions to BPI and Vogt…Since Kapsalis left Vogt Power, BPI and Vogt Power have not won any work from Calpine."  DN 251, p. 13, PageID #28324.  This bald statement is devoid of any context whatsoever and thus does not constitute evidence of damages to Vogt.   This is insufficient in response to the motion for summary judgment. "May" is insufficient at this stage.

Vogt states that "Additional sales may also have been made and/or additional sales may be on their way from other Vogt customers." DN 251, p. 31, PageID #28342.  As already stated, by agreement of the parties, the court's analysis is limited to evidence of record that has been offered in opposition to the summary judgment motion.

Vogt makes note of the Wolf Data Center project in its argument that Vogt has suffered damages as a result of Kapsalis' breach of the "Non-Divert" clause.  However, Vogt also notes that, despite Express' head-to-head competition for the contract, this project was never awarded.  Thus no diversion of business away from Vogt and  no damages to Vogt have been shown.

Vogt contends that "Any work that Express may get from Siemens in the future is necessarily a result of the qualification process, which generated from Kapsalis' actions during his period of restriction."  DN 251, p. 35, PageID #28346.

Vogt has not identified any damages to Vogt by virtue of the qualification of Express.  It has not alleged that the qualification caused the diversion of any business opportunities for contracts or relationships away from Vogt. Vogt identified no business written with Siemens. We are now well beyond the non-divert period.  After the expiration of the one-year restriction, Kapsalis would have been free to pursue qualified status for Express, or Express would have been free to pursue qualification on its own. Vogt has shown no damage by reason of the qualification of Express as a qualified supplier of Siemens.  The court finds no basis for Vogt's suggestion that by virtue of the qualification of Siemens, all sales forever after to Express constitute a diversion of business opportunities to Vogt by reason of Kapsalis' actions.

Finally, Vogt argues that since it was deprived of the benefit of its bargained-for year of "repose," Kapsalis should be ordered to repay "consideration" for the agreement, a sum in excess of $1 million. Vogt cites no authority for this proposition and is not a response to the assertion on summary judgment that Vogt has failed to adduce sufficient evidence of damages to support its claim for breach of the "Non-Divert" clause.

For the reasons set forth above, summary judgment will be granted as to Count II for breach of contract with respect to the "Non-Divert" clause of the Agreement.


IV. Plaintiffs' Motion for Contempt Against Kapsalis (DN 143)

Vogt seeks a finding of civil contempt for Kapsalis' alleged disobedience of the TRO and PI entered by Judge Heyburn in this case.  A record has been made by the magistrate judge (DN

279, PageID #29523), and the parties have filed proposed findings of fact and conclusions of law.  (DNs 323, 325, PageID #s 32206, 32334).  There is also a recent Motion for Leave to File Supplemental Evidence of Contempt which seeks leave of court to file a supplemental memorandum in support of their motion for contempt. (DN 426, PageID #34819).  Kapsalis has objected (DN 433, PageID #35054).  There will, no doubt, be a reply. The court will take the motion under advisement once it has been fully briefed.

As noted in *United States v. Work Wear Corp,* 602 F.2d 110, 115 (6th Cir. 1979), "Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience."

As related to the allegations of diversion of business opportunities, the non-divert period has long passed.  Therefore, any remedy sought by Vogt would be purely remedial.  Matters relating to confidential/trade secret materials remains ongoing.  However, Vogt has not sought coercive relief.  Rather, their focus is retrospective, contending that they have been "deprived of the benefits for which they paid Kapsalis hundreds of thousands of dollars."  DN 147-1, p. 28, PageID #3902 (sealed).  They seek default and monetary damages.  *Id.*

As coercive relief is not in issue, this essentially becomes a request for a judgment and court-driven decision on damages. "[A] decision on a contempt petition is within the sound discretion of the trial court…" *Domino's Pizza Franchising, LLC v. VTM Pizza, Inc.*, No. 15-13312, 2016 WL 2907966 (E.D. Mich. May 19, 2016*quoting Electrical Workers Pension Trust Fund of Local Union #58 v. Gary's Electrical Service,* 340 F.3d 373, 378 (6th Cir. 2003)(citing *Peppers v. Barry*, 873 F.2d 967, 968 (6th Cir. 1989)).

Therefore, this court, in its discretion, will hold the motion for contempt in abeyance pending further development of the remaining issues.

## V.  Conclusion

For the reasons set forth herein, summary judgment will be granted in part and denied in part, and the motion to compel will be held in abeyance.  A separate order will be entered this date in accordance with this opinion.

March 29, 2017

**IT IS SO ORDERED.**

**Charles R. Simpson III, Senior Judge**
**United States District Court**